# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF FLORIDA

## MIAMI DIVISION

FILED BY _____ D.C.

NOV 1 0 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

Brian Evans,

Plaintiff, pro se

2080 South Ocean Drive, Suite 1505

Hallandale Beach, FL 33009

(954) 214-3076

v.

Cerberus Capital Management, L.P.;

Ralph de la Torre;

Medical Properties Trust, Inc.;

**Michael Callum; and**

**Sanjay Shetty,**

**Defendants.**

**Civil Action No.: _____**

## EMERGENCY MOTION FOR PREJUDGMENT ATTACHMENT

Plaintiff moves for an Emergency Order of Prejudgment Attachment against Defendants Cerberus Capital Management, L.P.; Ralph de la Torre; Medical Properties Trust, Inc.; Michael Callum; and Sanjay Shetty, jointly and severally, pursuant to Rule 64 and Fla. Stat. §§ 76.01–76.12. This motion is brought on an emergency basis due to Defendants' history of concealment and dissipation of assets, as detailed in the attached Exhibit A (U.S. Senate Hearing S. Hrg. 118-472, Sept. 12, 2024).

## INTRODUCTION

Plaintiff seeks immediate prejudgment attachment to prevent Defendants from concealing, transferring, or dissipating assets pending judgment. The Congressional findings in Exhibit A establish that these Defendants have previously hidden funds, diverted resources, and enriched themselves while defrauding the public. The urgency of this motion arises from credible risk that Defendants will continue these practices to avoid accountability in this action.

## FACTUAL BACKGROUND

Exhibit A is a certified U.S. Senate hearing transcript titled "Examining the Bankruptcy of Steward Health Care: How Management Decisions Have Impacted Patient Care" (S. Hrg. 118-472, Sept. 12, 2024). The hearing, conducted by the U.S. Senate Committee on Health, Education, Labor, and Pensions, contains sworn testimony identifying Defendants Ralph de la Torre, Cerberus Capital Management, L.P., and Medical Properties Trust, Inc. as primary actors in a large-scale financial scheme that extracted billions of dollars from hospitals nationwide, leaving them bankrupt and unable to provide basic patient care.

As documented in Exhibit A, Senator Bernie Sanders stated that Dr. Ralph de la Torre became "obscenely wealthy" by loading hospitals with debt and selling their real estate to Medical Properties Trust while patients died from lack of care. The record shows Dr. de la Torre personally received hundreds of millions of dollars and used those funds to purchase a $40 million yacht, two private jets worth $95 million combined, and a $15 million luxury fishing boat—all while hospitals under his control could not afford life-saving medical supplies. The Senate found that Cerberus Capital Management made approximately $800 million in profit from this same scheme, and Medical Properties Trust's CEO received over $70 million in compensation linked to these transactions.

Witnesses testified that Steward's management "killed and maimed patients," that vendors went unpaid for months, and that the corporate executives funneled funds into personal luxuries while hiding financial records from regulators. Representative Michael Echols of Louisiana testified that Steward executives admitted on

the record to causing patient deaths and withholding supplies due to financial manipulation. Mayor Staci Mitchell and multiple nurses testified that Steward and its parent entities repeatedly failed to pay vendors, placing communities in jeopardy while their executives accumulated personal wealth.

These findings demonstrate a clear, continuing pattern of concealment and asset diversion by Defendants. The Congressional testimony establishes probable cause to believe Defendants have already hidden assets and are likely to do so again to frustrate judgment in this case.

## ARGUMENT

Under Fla. Stat. § 76.04 and Rule 64, a plaintiff may obtain a writ of attachment when defendants are likely to remove or conceal property to defeat collection of a judgment. The Congressional record in Exhibit A constitutes compelling evidence that these Defendants engaged in financial misconduct and concealment on a national scale. Their documented pattern of hiding money and diverting assets to shell entities warrants the immediate attachment of assets to preserve the status quo and prevent further fraud.

## CONCLUSION

For the reasons stated herein and supported by Exhibit A (U.S. Senate Hearing S. Hrg. 118-472, Sept. 12, 2024), Plaintiff respectfully requests that this Court grant an Emergency Order of Prejudgment Attachment against Defendants Cerberus Capital Management, L.P.; Ralph de la Torre; Medical Properties Trust, Inc.; Michael Callum; and Sanjay Shetty, jointly and severally.

Respectfully submitted,

Brian Evans

November 8, 2025

2080 S. Ocean Drive

Suite 1505

Hallandale Beach, FL 33009

Plaintiff, Pro Se

Exhibit A

S. Hrg. 118–472

# EXAMINING THE BANKRUPTCY OF STEWARD HEALTH CARE: HOW MANAGEMENT DECISIONS HAVE IMPACTED PATIENT CARE

# HEARING

OF THE

## COMMITTEE ON HEALTH, EDUCATION, LABOR, AND PENSIONS

### UNITED STATES SENATE

ONE HUNDRED EIGHTEENTH CONGRESS

SECOND SESSION

ON

EXAMINING THE BANKRUPTCY OF STEWARD HEALTH CARE, FOCUSING ON HOW MANAGEMENT DECISIONS HAVE IMPACTED PATIENT CARE

———

SEPTEMBER 12, 2024

———

Printed for the use of the Committee on Health, Education, Labor, and Pensions



Available via the World Wide Web: *http://www.govinfo.gov*

———

U.S. GOVERNMENT PUBLISHING OFFICE

57–254 PDF          WASHINGTON : 2025

BERNIE SANDERS (I), Vermont, *Chairman*

PATTY MURRAY, Washington
ROBERT P. CASEY, JR., Pennsylvania
TAMMY BALDWIN, Wisconsin
CHRISTOPHER S. MURPHY, Connecticut
TIM KAINE, Virginia
MAGGIE HASSAN, New Hampshire
TINA SMITH, Minnesota
BEN RAY LUJAN, New Mexico
JOHN HICKENLOOPER, Colorado
ED MARKEY, Massachusetts

BILL CASSIDY, M.D., Louisiana, *Ranking Member*
RAND PAUL, Kentucky
SUSAN M. COLLINS, Maine
LISA MURKOWSKI, Alaska
MIKE BRAUN, Indiana
ROGER MARSHALL, M.D., Kansas
MITT ROMNEY, Utah
TOMMY TUBERVILLE, Alabama
MARKWAYNE MULLIN, Oklahoma
TED BUDD, North Carolina

WARREN GUNNELS, *Majority Staff Director*
BILL DAUSTER, *Majority Deputy Staff Director*
AMANDA LINCOLN, *Minority Staff Director*
DANIELLE JANOWSKI, *Minority Deputy Staff Director*

(II)

# C O N T E N T S

---

## STATEMENTS

### THURSDAY, SEPTEMBER 12, 2024

Page

#### COMMITTEE MEMBERS

Sanders, Hon. Bernie, Chairman, Committee on Health, Education, Labor, and Pensions, Opening statement ............................................................... 1
Cassidy, Hon. Bill, Ranking Member, U.S. Senator from the State of Louisiana, Opening statement ............................................................... 4

#### WITNESSES—PANEL I

de la Torre, Ralph, Dr., Chief Executive Officer, Steward Health Care System, Dallas, TX ............................................................... 5

#### WITNESSES—PANEL II

MacInnis, Ellen, R.N., Nurse at St. Elizabeth's Medical Center, Boston, MA ... 6
    Prepared statement ............................................................... 8
    Summary statement ............................................................... 10
Sprague, Audra, R.N., Former Nurse at Nashoba Valley Medical Center, Lunenburg, MA ............................................................... 10
    Prepared statement ............................................................... 13
    Summary statement ............................................................... 14
Albritton Mitchell, Staci, Mayor, West Monroe, LA ............................................................... 15
    Prepared statement ............................................................... 16
Echols, Hon. Michael Charles, Representative, Louisiana House of Representatives, Monroe, LA ............................................................... 17
    Prepared statement ............................................................... 19

#### ADDITIONAL MATERIAL

Statements, articles, publications, letters, etc.
Sanders, Hon. Bernie:
    Statement from Senator Casey ............................................................... 35
    Letter from a Physician associated with Sharon Regional ............................................................... 35
    Letter from Dr. Garrow Primary Health Network ............................................................... 36
    Letter from the City Manager of Sharon, PA ............................................................... 37
Cassidy, Hon. Bill:
    Letter from Alexander J. Merton, Quinn Emanuel ............................................................... 38
    Letter to Alexander J. Merton, Quinn Emanuel, from the HELP Committee ............................................................... 39

(III)

# EXAMINING THE BANKRUPTCY OF STEWARD HEALTH CARE: HOW MANAGEMENT DECISIONS HAVE IMPACTED PATIENT CARE

### Thursday, September 12, 2024

U.S. SENATE,
COMMITTEE ON HEALTH, EDUCATION, LABOR, AND PENSIONS,
*Washington, DC.*

The Committee met, pursuant to notice, at 10:01 a.m., in room 562, Dirksen Senate Office Building, Hon. Bernard Sanders, Chairman of the Committee, presiding.

Present: Senators Sanders [presiding], Casey, Baldwin, Murphy, Kaine, Hassan, Hickenlooper, Markey, Cassidy, Collins, Braun, Romney, and Budd.

## OPENING STATEMENT OF SENATOR SANDERS

The CHAIR. The Committee on Health, Education, Labor, and Pensions will come to order. It's very significant here in America today, we have a healthcare system, which in my view going to say the healthcare system is broken, but it's currently not the only thing that's broken. We have a healthcare system that is broken, dysfunctional, and cruel. Too often it is a system that is designed not to make patients well, but to make healthcare executives and stockholders extraordinarily wealthy.

There cannot be a clearer example of that than private equity billionaires on Wall Street who are making billions by purchasing hospitals throughout our Country, stripping all of their assets, and loading them up with debt that these hospitals could never pay back. Perhaps more than anyone else in America, Ralph de la Torre, the CEO of Steward Healthcare, is the poster child for this outrageous type of corporate greed that is permeating our for-profit healthcare system.

Working in partnership with a private equity firm, Cerberus, Dr. de la Torre became obscenely wealthy by loading up hospitals from Massachusetts to Arizona with billions of dollars in debt and selling the land underneath these hospitals to real estate executives at Medical Properties Trust who charged unsustainably high rents. As a result of Dr. de la Torre's elaborate financial scheme, Steward Healthcare and the more than 30 hospitals it owns in eight states, declared bankruptcy with some $9 billion in debt.

But let's be clear, Steward's severe financial problems did not happen overnight. They have been going on for more than a dec-

(1)

2

ade. It has been estimated that at least 15 patients at hospitals owned by Steward died as a result of a lack of medical equipment or staffing shortages, and that at least 2000 other patients were put in serious risk according to Federal regulators. Since 2019, Federal inspectors have cited Steward-owned hospitals over 30 times for putting patients in "immediate jeopardy" meaning the patients died, were put at grave risk, or were injured.

In 2014, Steward shut down the Quincy Medical Center, Massachusetts, with the exception of its emergency room, which it shut down 6 years later. Today, Quincy is the largest city in Massachusetts without an emergency room. In 2018, Steward shut down the Northside Regional Medical Center in Youngstown, Ohio, closing the only labor and delivery unit in that city for pregnant women and their babies, and laying off 468 healthcare workers in the process.

Last year, Steward shut down the Texas Vista Medical Center, the main healthcare option for San Antonio's south side after it missed over $650,000 in payments to medical suppliers leaving the hospital with a severe shortage of respiratory masks among many other things. Last month, state regulators required Steward to shut down St. Luke's Behavioral Center in Phoenix, Arizona after they found that it had been without air conditioning in Phoenix, as temperatures soared past 100 degrees, putting more than 70 patients at risk of heat exposure.

Steward has also shut down pediatric wards in Massachusetts, Louisiana, closed neonatal units in Florida and Texas, and eliminated maternity services at a hospital in Florida. We know that Steward has gone bankrupt. We know that several of its hospitals have already been forced to close their doors because they ran out of money.

But the question that is interesting to me is, in the midst of all of that, how is the main person behind all of these efforts, Dr. de la Torre, how's he doing financially? While hospitals shut down, while patients go without care, while healthcare workers lose their jobs, how has Dr. de la Torre been doing in terms of his own financial well-being? And the answer is that he has been doing phenomenally well.

While Steward was busy shutting down hospitals, the companies he owned received $250 million in compensation over a 4-year period. Let me repeat. He personally received hundreds of millions of dollars, some of which, remember, hospitals shut down, patients without care, workers being laid off, and some of that money he used to purchase this $40 million yacht.

While Steward Hospitals were severely understaffed, patients were not getting the care they desperately needed, Dr. de la Torre was able to afford this $15 million custom made luxury fishing boat. $15 million fishing boat while patients were dying. While Steward-owned hospitals cannot afford to pay for life saving medical supplies, it had enough money to purchase a $62 million private jet, and incredibly, a $33 million backup jet that Dr. de la Torre and his family used for non-business trips throughout the world.

3

While Steward's hospitals were laying off hundreds of workers, de la Torre made a $10 million charitable contribution to an exclusive prep school in Dallas that was fully paid for by Steward Healthcare, not his own personal funds. How many of Steward's hospitals could have been prevented from closing down? How many lives could have been saved? How many healthcare workers would still have their jobs today if Dr. de la Torre spent $160 million on high quality healthcare at the hospitals he managed, instead of a yacht, two private jets, a luxury fishing boat, and a huge contribution to a wealthy prep school.

Today, we will be hearing from nurses in Massachusetts and from public officials in Louisiana who have firsthand knowledge of the harm Steward has caused the patients, the healthcare workers, and the communities in which they live. I look forward to hearing from these panelists very soon. As the Chairman of this Committee, I look forward to working with Ranking Member Cassidy, and I want to thank him and his staff for their cooperation on this effort.

Senator Markey, I want to thank Senator Markey for his leadership. He is from Massachusetts. They have been very hard hit by Steward. And I hope that we will be working together every Senator, Democrat and Republican, to hold Dr. de la Torre accountable for his financial mismanagement and his greed.

But let me conclude by saying this. Dr. de la Torre did not act alone. Who else besides de la Torre benefited financially as a result of Steward's bankruptcy? Cerberus, the private equity firm he partnered with, made an estimated $800 million profit from its investments in Steward Healthcare. From 2017 through 2021, the CEO of Medical Properties Trust received about 70 million in bonuses, stock, awards, and salary. How much of that compensation came as a result of its financial arrangements with Steward?

The collapse of Steward Healthcare is just one extreme example of the damaging role in my view, that private equity is having on our healthcare system. Private equity firms have bought, bought up hundreds of hospitals, thousands of nursing homes, and tens of thousands of medical practices, saddling them up with unsustainable debt and stripping their assets to make huge profits for their executives and their investors.

Study after study has shown that on average, when a private equity firm takes over a hospital, a nursing home, or another medical provider, the price of healthcare goes up, the quality goes down, and healthcare workers are asked to do much more with fewer and fewer staff. The issue of private equity and healthcare is an issue this Committee must look into. We cannot allow wealthy private equity executives to treat our healthcare system as their own personal piggy bank.

Healthcare in America, in my view, must be a human right for every man, woman, and child in this country, and not simply an opportunity for billionaire investors to make huge profits.

Senator Cassidy, I want to thank you for your hard work on this, and you are recognized for an opening statement.

4

## OPENING STATEMENT OF SENATOR CASSIDY

Senator CASSIDY. Thank you, Senator Sanders.

For months this Committee has engaged in a bipartisan investigation into the bankruptcy of the Steward Healthcare and the impact on the delivery of its care at its hospitals. And I would add therefore, on the impact of the healthcare of the patients those hospitals served. It was quickly evident that breaking down the management decisions of Chief Executive Officer Dr. Ralph de la Torre is essential to understand Steward's financial problems.

Steward's bankruptcy has nationwide implications impacting more than 30 hospitals across eight states, including Glenwood Regional Medical Center in West Monroe, Louisiana. According to a report from the Centers for Medicare and Medicaid Services, a physician at Glenwood told a Louisiana State Inspector, "the hospital was performing Third World medicine."

Because of management decisions resulting in limited resources at Glenwood, the state had to force the hospital to operate at one-third capacity. One patient died waiting for a transfer to another hospital, because Glenwood lacked resources to treat. Glenwood is also the largest employer in West Monroe and West Ouachita Parish, at one point employing 9 percent of the community.

Now, hospitals like Glenwood are essential to the both physical and financial health of the communities they serve. We need to keep this from happening again. That means we need answers, and it seems the principle to give that answer is Dr. Ralph de la Torre, and this is what our bipartisan work has been about; answers for our constituents, answers to inform legislative solutions.

Unfortunately, Dr. de la Torre has refused to testify voluntarily. As a result, the Committee issued a subpoena in July. Up until September the 4th, Dr. de la Torre's lawyers indicated he intended to comply with the subpoena and to testify. However, 8 days before the hearing, Dr. de la Torre informed the Committee that he would not comply with the subpoena. We responded to Dr. de la Torre explaining why his objections to the Committee's subpoena have no merit and directed him to comply.

Now a witness cannot disregard and evade a duly authorized subpoena. Therefore, today the Chairman and I will be asking the Committee to report a resolution to authorize civil enforcement and criminal contempt proceedings against Dr. de la Torre, requiring compliance with the subpoena. I thank the Chairman for working with me on this critically important issue. I believe our actions today are a testament to what bipartisanship can accomplish on behalf of Americans, on behalf of patients. Thank you.

The CHAIR. Thank you, Senator Cassidy. And again, I want to thank you and your staff for their bipartisan efforts. As Senator Cassidy mentioned, our first witness is Dr. de la Torre, but as I think everybody can see, Dr. de la Torre is not here. He was subpoenaed to testify at 10 a.m. this morning. On September 4th, 2024, counsel for Dr. de la Torre sent a letter to the Committee, objecting to the compelled testimony and declining to comply with the subpoena. The next day, the Committee overruled these objec-

5

tions in their entirety and informed his attorneys that we expected to see Dr. de la Torre today.

Dr. de la Torre is not present in the room at this time, so I now call up our second panel of witnesses. Panel, if you would come to the dais, we would appreciate it.

[Pause.]

The CHAIR. All right. Let me thank all of our witnesses. We have four excellent witnesses from Massachusetts, Louisiana, and we thank them all for being here. Senator Markey has played a very important role in driving this investigation and has had a huge impact on communities throughout Massachusetts. So Senator Markey, I'd appreciate it very much if you can introduce our first two witnesses.

Senator MARKEY. Thank you, Mr. Chairman, very much, and thanks to you and Ranking Member Cassidy for your leadership on this issue.

Again, I continue to be grateful for partnering with the Subcommittee hearing that we had in April up in Boston to hold Steward Health accountable. Greed thrives in the dark, and these witnesses are bringing this story into the light.

Our first witness is Ms. Ellen MacInnis. Thank you for being here today. Ms. MacInnis serves on the Massachusetts Nurses Association Board of Directors. She has worked as a nurse for 35 years, including over 25 years at St. Elizabeth's Medical Center, a Steward-owned hospital. Ms. MacInnis worked in the coronary care unit, in the medical intensive care unit, and for 20 years in the emergency department. So we thank you Ms. MacInnis for your testimony. And we very much appreciate your leadership on this issue right from the very beginning.

The CHAIR. Let's introduce the other witness as well, and then we'll introduce all the witnesses and then we'll hear the testimony.

Senator MARKEY. The next witness is Mrs. Audra Sprague. Thank you for being here. Mrs. Sprague served as the co-chair of the Massachusetts Nurses Association at the Nashoba Valley Medical Center since 2015. She has also served as a member of the Massachusetts Board of Registration in nursing since 2021. Mrs. Sprague worked at the Nashoba Valley Medical Center in the emergency department for 17 years. She, alongside almost 500 healthcare workers and administrators, lost their jobs late last month when the bankruptcy court approved Nashoba Valley's closure due to Dr. de la Torre's financial mismanagement of Steward.

We thank you for being here. We thank all the hardworking healthcare workers like you and Ms. MacInnis who are fighting for patients, not just in Massachusetts, but all across our Country. You continued to save lives even as the resources were being drained out of your hospital. Thank you.

The CHAIR. Senator Cassidy, do you want to introduce the panelists from Louisiana?

Senator CASSIDY. Please. Although they're not sitting in that order, I'm going to ask Mayor Mitchell to go first. So I'll introduce her first. Staci Mitchell is the mayor of West Monroe, Louisiana, has held this role since 2018. Mayor Mitchell has served her com-

munity for many years previously as an alderman for West Monroe and owning a successful business for 20 years. She also serves as a board member of Glenwood, and her role on that board gives us insight into the day-to-day operations of Glenwood and their challenges.

She holds a Bachelor's of Science in Agricultural Economics from Louisiana State University. And Mayor Mitchell, thank you for being here. And by the way, I trust West Monroe is doing well with the hurricane?

Ms. MITCHELL. Yes.

Senator CASSIDY. Next, I will introduce State Representative Michael Echols. And Michael is a state representative first elected in 2019, representing District 14, which includes Monroe and Ouachita Parish. Representative Echols serves on a number of important committees, including the Health and Welfare Committee, where he has spent significant time investigating Glenwood Regional Medical Center and their mismanagement. And he'll bring to this table the insights learned from the Louisiana Legislative Sessions. He holds a Bachelor of Science in Accounting from the University of Louisiana, Monroe, and a MBA from the University of Louisiana, Monroe.

Thank you both for being here.

The CHAIR. Thank you, Senator Cassidy.

Ms. MacInnis, the floor is yours, and thank you very much for being with us today.

### STATEMENT OF ELLEN MACINNIS, R.N., NURSE AT ST. ELIZABETH'S MEDICAL CENTER, BOSTON, MA

Ms. MACINNIS. Thank you, Senator.

The CHAIR. Just make sure the mic is on and talk into it and hold it close to your mouth for that, please. A little bit closer.

Ms. MACINNIS. Okay. Thank you, Senator. Thank you. Thank you, Senator Sanders, and Members of this Committee. My name's Ellen MacInnis. I'm a nurse at St. Elizabeth's Medical Center in Boston. I've been there 26 years. For the first 12 years I worked at St. Elizabeth's, we were operated by the Archdiocese of Boston, and then Cerberus Capital came along, Steward came along, and it's been downhill since then.

We have 2,800 Massachusetts Nurses Association nurses and healthcare professionals working at Steward Hospitals. I'm proud and honored to be representing them today. We hope that we can provide a unique perspective on this issue, because we are the front-line providers, we provide more than 90 percent of the care delivered at Steward Hospitals.

The corporatization and commodification of healthcare is the guiding ethos of Steward. It's the one and only priority, and it has led to horrific suffering and harm to our patients, the people who take care of our patients, and our communities. The immediate and most debilitating impact of the ownership of Steward was the Steward's tendency to understaff units whenever and wherever they can. I spent 20 years working in the emergency department at St. Elizabeth's, and I can tell you we always struggled to have

7

enough staff, enough equipment, enough supplies to keep our patients safe.

Probably one of the biggest impacts is after a patient is admitted to the hospital, they end up sitting in the emergency department for hours to sometimes a couple of days, because the units where they should be admitted and safely cared for are not staffed. This chronic understaffing has resulted in preventable harm and even death. *The Boston Globe* just ran a front-page expose, highlighting some of the tragic consequences at Steward Hospitals. This included two patients at Holy Family Hospital in Methuen who died in the emergency department because they weren't immediately assessed and they weren't monitored, and that relates directly to severe understaffing of that department.

At Good Samaritan, two patients died after spending hours in a significantly understaffed emergency department. One 81-year-old gentleman came in for chemotherapy for his pancreatic cancer, and by the time staff got to him, he was dead. There were 95 patients in that emergency department on that shift, and only 11 nurses. It is absurd to think that 11 nurses can care for that number of patients. Another Steward hospital, sadly enough, a 28-year-old gentleman came in. He was in an acute mental health crisis. He was placed in restraints for his own safety, and there was nobody available to closely monitor him, which is what statute provides for. And when he went into distress, nobody was there to rescue him and he's dead.

All of these were preventable. We also have seen Steward fail to provide the supplies and the equipment that we need. Either the supplies don't come through the front door because we're on a credit hold and nobody will bring them to us. Also, our equipment it's not properly maintained. We have IV pumps and computers with battery lives of seven to 10 seconds, because the maintenance just hasn't been done.

During my time in the emergency department, I worked nights, there were nights that we didn't have any Similac or Pedialyte or even diapers. I can think of two separate occasions where staff went out in the middle of the night to a 24-hour store to get those supplies. Also, we frequently didn't have food kitchens locked up. And I personally have given my dinner, my meals to patients, and staff has chipped in and sent out and had food brought in for patients.

Sadly enough, sometimes babies die, newborn babies die, and the practice is to place the baby's remains in a bereavement box and take it to the morgue. Steward didn't pay the vendor, and there weren't any bereavement boxes and nurses were forced to put babies' remains in cardboard shipping boxes. These nurses put their own money together and went to Amazon and bought the bereavement boxes.

Gosh, there's so much more to say. Probably the most tragic and what finally blew the lid off all this, was the death of a 39-year-old woman who came to the hospital, had an absolutely normal childbirth, was bleeding. She may have been saved by a device known as an embolism coil. There weren't any in the hospital.

8

There hadn't been any in the hospital for weeks. They had been repossessed by the vendor. She died.

Steward has also caused the closure of Quincy Medical Center. I grew up in Quincy. This was very close, very close to my heart. And now Nashoba and Carney Hospital. Carney Hospital sees more than 30,000 patients a year. Boston AMS takes 6,000 patients a year to Carney Hospital. Where are they going to go? We don't have the capacity in Boston for this. I know we have a lot of hospitals, we also have a lot of patients.

Just to be clear, we need not to let this happen again. And thank you for coming together, and it's my sincerest hope that you can put an end to this. Thank you.

[The prepared statement of Ms. MacInnis follows.]

PREPARED STATEMENT OF ELLEN MACINNIS

Thank you, Senator Sanders and to the other Members of this Committee for the invitation to testify today.

My name is Ellen MacInnis, a former Steward nurse at St. Elizabeth's Medical Center in Boston, and a member of the Massachusetts Nurses Association Board of Directors. I have the honor and privilege of representing more than 25,000 RNs and health professionals working in facilities across the Commonwealth from Cape Cod to the Berkshires. This includes more than 2,800 RNs and health professionals working in eight of the nine Steward owned hospitals in Massachusetts. In coming here today I hope to provide a unique perspective on the issue, as we are the frontline providers who deliver 90 percent of the clinical care patients receive at these facilities. We also can provide a unique historical perspective as our members have worked at nearly every facility owned or operated by for-profit entities—be they private equity firms, or traditional for-profit providers accountable to shareholders on Wall Street since these firms first entered our state back in the 1990's.

As a nurse who has given decades of service at St. Elizabeth's Medical Center, I had worked at the facility when for years it was a not for profit facility run by the Archdiocese of Boston, and for the last 14 years following the purchase of our hospital by Cerberus Capital Management, and soon to be named Steward Healthcare.

From the perspective of nurses and health professionals on the front lines of the Steward system the impact on our patients and our communities was the same— the corporatization and commodification of health care which is the guiding ethos of Steward and other such providers has left a trail of broken promises made to these communities and the state agencies responsible for the regulation of these providers, and more importantly, to the degradation of patient care leading to an unprecedented level of suffering for the patients and families who depend on us for their health and safety.

The immediate and most debilitating aspect of ownership by Steward for those of us charged with providing care to patients was the chronic lack of staff needed to deliver appropriate timely care to our patients. Having spent 20 years working a busy, urban emergency department, I can tell you we were always struggling to provide life-saving emergency care in a department that was often overwhelmed with patients, with patients boarding in hallways going without care, including critically ill patients waiting to be admitted to our intensive care units, but these patients couldn't be moved to those units due to the lack of needed staff. Every day was a constant struggle to convince Steward to add the staff we needed to meet the needs of patients and every day, little or nothing was done to address our concerns. And it was the patients who suffered the consequences, in delays in receiving needed medications and treatments, in care left undone, with patient suffering preventable falls and in too many cases, severe harm and even deaths.

The *Boston Globe* just ran a frontpage expose highlighting some of the tragic consequences of these staffing shortages at Steward Hospitals. This included two patients at Steward owned Holy Family Hospital in Methuen Mass who died in the hospital's emergency department, one a 38 year-old and another 81 year-old male who both died from being undiagnosed and going without proper monitoring in the ED due to the lack of staff on hand to provide that monitoring and assessment.

9

At Steward Good Samaritan Hospital in Brockton, two other patients died after spending hours in an emergency department significantly understaffed. In one instance, a patient admitted for chemo therapy for pancreatic cancer died alone on a stretcher in a hallway, after spending hours waiting to be seen at a time when the ED was staffed with just 11 nurses caring for 95 patients. No ED nurse should be expected to or can safely care for eight or nine patients at a time, but at this hospital, and other Steward hospitals, this was a regular occurrence.

At another Steward Hospital, a patient experiencing an acute mental health crisis who was placed in restraints, who was supposed to be receiving one to one monitoring to ensure his safety, ended up dying because the hospital was unable to provide that level of monitoring due to the lack of staff.

These were not isolated instances, and I emphasize, all of them were totally preventable.

The other common issue for Steward which severely compromised staff's ability to provide the care our patients deserve was the lack of supplies and equipment needed for the care of patients. This ran the gambit from the lack of basic necessities to life saving equipment.

During my time in the emergency department, there were many nights when we didn't have baby formula on hand for a mother or clean onesies for an infant who had soiled themselves while coming to us for care. Or often at night, there were no food stuffs to feed a hungry diabetic or patients who were waiting for hours to be seen, forcing us to send one of our colleagues out to purchase these basic necessities.

We had nurses going from floor to floor searching for needed medical supplies, such as IV tubing, bandages, linens, you name it, all of it not available because the vendors who supplied those materials hadn't been paid by Steward for months, and were now placed on vendor hold waiting for that overdue payment.

A more egregious and appalling example at my hospital was the failure of Steward to ensure a supply of bereavement boxes, which are the cases used to carry the remains of deceased newborns to the morgue. Instead, staff were expected to transport these remains in banker's and shipping boxes. To compensate for this indignity it was left to our own nurses to go on line and purchase appropriate containers on Amazon.

The most tragic example, also reported in the *Boston Globe*, was the tragic and preventable death of a 39 year-old mother simply because the embolism coil that would have saved her life had been repossessed by another unpaid vender.

In addition to the lack of supplies, we watched Steward totally neglect the infrastructure of our facilities, allowing equipment to go unrepaired, and to see once proud institutions deteriorate before our eyes. At one of our facilities, a suicidal patient leaped to his death from a window that was supposed to be locked shut, but was instead pried open because of its being in severe disrepair.

At my hospital, several floors went 36 hours without electricity due to faulty wiring and electrical issues, forcing nurses to run long extension chords to be able to run monitors and other equipment needed to monitor and treat patients.

Let us be clear, none of this is acceptable on any level at any time. All of it was preventable. Those responsible for this needless suffering deserve to be held accountable for both their actions, and their inaction, which is why we are here speaking to you today, in the hope that you will find a way to hold Steward and Ralph de la Torre accountable for what they have done to our patients and our communities. And beyond that, we hope you can use this process and your power to prevent such harm from being caused by other providers who choose to place their desire for profit margins over their mission of caring for the most vulnerable among us.

Finally, we think it is important to point out that it is not just Steward, private equity or other types of for-profit providers that need to be held accountable. Our state and Federal agencies that are charged with regulating and ensuring the safety of our health care providers and facilities must also be held accountable for doing their part in protecting the public. We want to make clear that our nurses and our association went to great lengths over a period of years to document and report the behavior, practices and outcomes at our facilities to all levels of state and Federal Government, and it wasn't until the bankruptcy filing was announced that there was any real or meaningful effort to address our concerns about Steward. We would also point out that while Steward is definitely a bad player in the health care market, they are by no means alone.

It is our hope that this crisis can serve as a wake up call to all levels of government and to the public that the danger to our public health from the influence of the profit motive into health care is significant and that we all must do our part

10

to change the system to protect our most valuable resource—the health and well being of all who live in this great nation.

———

[SUMMARY STATEMENT OF ELLEN MACINNIS]

My name is Ellen MacInnis, a 26-year nurse at Steward St. Elizabeth's Medical Center in Boston, and a member of the Massachusetts Nurses Association Board of Directors. I have the honor and privilege of representing more than 2,800 RNs and health professionals working in eight of the nine Steward owned hospitals in Massachusetts.

My testimony will provide a unique perspective on the issue, as we are the frontline providers who deliver 90 percent of the clinical care patients receive at these facilities.

From the perspective of nurses and health professionals on the front lines of the Steward system the impact on our patients and our communities was the same—the corporatization and commodification of health care which is the guiding ethos of Steward and other such providers has left a trail of broken promises made to these communities and the state agencies responsible for the regulation of these providers, and more importantly, to the degradation of patient care leading to an unprecedented level of suffering for the patients and families who depend on us for their health and safety.

The testimony details how Steward's failure to provide appropriate staffing at their facilities led to a host of patient injuries, including a number of preventable patient deaths at five different facilities.

It will highlight the impact on patient care of Steward's failure to pay its vendors, resulting in nurses and other staff being unable to find basic supplies, as well as lifesaving equipment, in two cases, leading to patient deaths.

Finally, it will call for accountability for Steward and its executives for the harm they have caused for the hundreds of thousands of patients and communities it had a mission to serve, while also calling for future accountability for all health care providers who place a priority of profits over the delivery of patient care.

———

The CHAIR. Thank you very much.

Ms. Sprague.

By the way, if you need more than 5 minutes, that's fine. Take seven, 8 minutes if that's what you guys need.

## STATEMENT OF AUDRA SPRAGUE, R.N., FORMER NURSE AT NASHOBA VALLEY MEDICAL CENTER, LUNENBURG, MA

Ms. SPRAGUE. Thank you. Thank you, Senator Sanders, and the Members of this Committee for bringing this to the forefront. My name is Audra Sprague. I'm a registered nurse. I worked at Nashoba Valley Medical Center for 17 years.

Steward Healthcare systematically extracted every possible dollar that they could get out of our hospital until it led to its closure 12 days ago on August 31st, 2024. Since Steward's ownership, I have witnessed personally myself some firsthand devastating effects of the company's practices of reducing overhead to financially benefit their stakeholders and their CEO, with no regards for the patients and the impact on the patients and their care and the family and our staff.

Under Steward, essential resources began to dwindle repairs that once would've been done immediately, were put off and delayed, sometimes they weren't addressed at all. For example, if you have a critically ill patient, you need IV access as quickly as you can to give them fluids and medications. And if you can't get it within a very reasonable small amount of time, you use what's a mechanical

11

drill called an IO to go through the bone, into the bone marrow. But it's mechanically powered, so it goes faster, and less trauma and pain for the patient.

Our drill battery died and it's a closed system, so the vendor hadn't been paid. We couldn't get one from that vendor, so they had to source it from another place. We ended up getting this sub-par—it was like a Fisher Price toy. It felt like it was this mechanical, like you had to hand pump it to get this big bore needle to go through the bone into a patient. Technically it worked, but it was ridiculously poor quality. And it's just a perfect example of Steward only cared about the money and didn't care about what was happening to the patients.

As beds broke, they weren't repaired. So, when our census would increase, we would have to rent beds for a long time. Then all of a sudden, we couldn't even rent the beds because we were on credit holds. So, we were forced to transfer patients to other facilities because we didn't have the physical bed for them to lay down in an actual hospital bed.

Our hospital is licensed for 57 medical beds, plus 20 geriatric psychiatric beds. Of the 57 medical beds, by the time we closed, we probably had around 18 to 20 working beds. So, working under these conditions became overwhelming for everybody, nurses, doctors, anybody in the hospital at every different level. Due to the chronic understaffing and lack of supplies, it became our burden to try and make up for the financial, like strain that we were under. So, we would keep that same level of care for the patient whenever we could by hiding the chaos that was going on outside and hiding all of the things that had to be done to get the care for that patient. And it was exhausting.

It's already a very demanding job, and they made it almost impossible to do. On July 5th, 2023, I had to bring my then 18-year-old son into the ER at Nashoba. I knew he would be cared for well, I trusted every single person in there. But Steward had made it so there was such low staffing and didn't care about the constant pleas for, we needed more staffing on overnights. He was diagnosed with new onset type 1 diabetes and was in diabetic ketoacidosis, which is a life-threatening complication of type 1 diabetes. He was admitted as an ICU patient into the hospital.

But there was no ICU beds. There was beds, there just wasn't nurses because they hadn't staffed it. So, he had to stay in the ER that entire night. That night, there were two nurses staffed in the ER, despite us constantly saying we needed more, and there were 18 patients in the ER that night. So, no way in the world could two nurses, no matter how fast they were, how hard they worked, no matter what, could care for 18 patients.

In the state of Massachusetts, if you're an ICU patient, you should have one-to-one nursing, at times one-to-two, but at a minimum, it should be one-to-one on an insulin drip. The nurses there could not meet all the needs. They couldn't get to all the patients. So, I myself had to take care of my own child, titrating the drip, making sure that he was getting what he needs on the critical and emergent needs that he had being in diabetic ketoacidosis.

12

The lack of overnight staffing in that ER has been ongoing. It was a known patient safety issue. Despite our local administration, our local hospital, CEO, CNO, acknowledging it and wanting to support it and wanting to fill it, corporate no matter what, they would just say no. In our negotiations that had just ended a few months before on the new contract, we wanted a third nurse on nights. We asked for it over and over, and the corporate negotiators were like, "Nope, you don't need it, you can't have it," despite everybody saying it was needed?

But to ensure that my son received the critical time sensitive care he needed, I had to be his nurse that night and not his mother. And he deserved to have both. He deserved to have a one-on-one nurse and a mother there to support him. And I wasn't able to do that because I had to focus on his nursing care and make sure that he was Okay.

Steward's abrupt closure of Nashoba with barely 30 days' notice has left our region without critical healthcare services. Our transport times for ambulances have doubled or tripled, our local EMS systems are in no way going to able to consistently meet these needs, and there was no time to buildup. They just said, "Nope, we're closing. 30 days, that's it." And we have no public transportation. There's not even Ride or, Lyft, Uber, anything near us. Maybe every now and then you can get one.

But the closure has resulted in longer waiting times for emergency care, for essential screening tests at other hospitals like mammograms, colonoscopies, all of those things now, other hospitals are going to have to add all of our patients that were getting those services at Nashoba into these hospitals, that they were already overwhelmed, especially in the emergency departments at the two closest hospitals to us.

Moreover, Nashoba's closure has left the primary care physicians that are still in place, with no place to send them for diagnostic testing like X-rays, CTs, ultrasounds, MRIs. They have to go drive a half hour to get, any of those services, if they can get in for them.

It's just, Steward has a pathological lack of concern for anyone but themselves. They do whatever is good for them. They repeatedly misrepresented or outright falsified information to the state regulators intending to downplay the impact of the closure. For instance, DPH inquired about the closure plan, what the transportation options would be in our area after the closure so patients could get back and forth to appointments. In the response to DPH's question, Steward cited, a company called Here to There Transport, and said that they are providing 24/7 transportation. The way it was worded was completely meant to imply that this was going to solve the situation. Here to There Transport is one woman named Joanne.

[Laughter.]

Ms. SPRAGUE. She is lovely, like, don't get me wrong, but she used to provide us with vouchers for patients that would need a cab ride home or some sort of transportation home, but she mainly does airport transport, so she needs to sleep. And she's not 24/7. She's one person. And then she even stopped doing that because Steward wouldn't pay them. So, she would provide the transport—

13

and so it's definitely not a solution for our entire community's healthcare needs.

They portrayed us as a failing hospital with declining census to justify closure in the state. But the narrative conceals that the corporative executives have systematically deprived our hospital of essential resources for years, including not giving us consistent gastroenterology, general surgery, urologists, anesthesiologists. And as a result, Nashoba was forced to transfer our patients for care that we could no longer provide.

The Steward's greed has put lives at risks and their action is going to kill people. And it's left a complete hole in our community that despite the warnings and pleas, nothing's been done to stop them. They have unchecked greed across the board. And it's not just a business failure, it's a human tragedy waiting to happen in our region. Thank you.

[The prepared statement of Ms. Sprague follows.]

PREPARED STATEMENT OF AUDRA SPRAGUE

My name is Audra Sprague, and I was a registered nurse in the ER at Nashoba Valley Medical Center for 17 years. Steward Health Care systematically extracted every possible dollar from our facility, leading directly to its closure 12 days ago on August 31, 2024. Nashoba Valley Medical Center was vital to the health of residents in our region.

Since Steward took ownership, I've witnessed and experienced firsthand the devastating effects of the company's practices of reducing overhead to financially benefit the stakeholders. Under Steward, essential resources began to dwindle. Repairs that once would have been immediate were significantly delayed, if addressed at all. For example, when we were unable to gain IV access quickly on a critically ill patient, best practice is to use a mechanically powered drill that inserts a needle into bone marrow, allowing us to administer medications and fluids. When the battery died on our drill, Steward failed to pay the vendor, leaving us without a functioning drill. They eventually replaced it with a subpar hand-pump manual drill, which was technically compliant but woefully inadequate for the needs of critically ill patients.

As beds broke, they were not repaired. When the census increased, we would rent beds, until the vendors put us on "credit hold" because bills were not paid. We were forced to transfer patients to other hospitals for care because we didn't have a physical bed to put them in. Our hospital was licensed for 57 medical beds, but at the time of our closure, we had approximately 18 working medical beds.

Working under these conditions was overwhelming. Basic nursing tasks were challenging due to chronic understaffing and lack of supplies. The nurses and doctors shouldered the burden of maintaining the standard of patient care. We became very adept at doing more with less, but it made an already demanding job nearly impossible.

On July 5, 2023, I brought my then 18-year-old son to the ER at Nashoba. He was diagnosed with new-onset Type 1 diabetes and was in diabetic ketoacidosis, which is a life-threatening complication. He was admitted as an ICU patient, but due to a lack of staffing in the ICU, my son was forced to stay in the ER as an ICU boarder. That night, there were 18 patients in the ER. In Massachusetts, an ICU patient on an insulin drip, by law, should have 1:1 nursing care. His nurse in the ER had 8 other patients to care for. I had to provide his care myself, as the two ER nurses could not possibly meet the critical and emergent needs of all 18 patients. The lack of overnight nursing staff in the ER was an ongoing patient safety issue. Despite local administration's support for more nursing staff on the overnight shift, repeated requests were dismissed during contract negotiations by Steward's corporate executives. To ensure my son received the critical, time-sensitive care he needed, I had to act as his nurse that night instead of his mother. He deserved to have his mother and a 1:1 nurse. Steward's abrupt closure of Nashoba, with barely 30 days notice, has left our region without critical healthcare services.

Transport times have doubled or tripled one way. Our local EMS systems will not be able to consistently meet the demand, which is made worse by the lack of public transportation. The closure has resulted in longer wait times for emergency care

14

and essential screening tests, such as mammograms and colonoscopies, at hospitals farther away. Moreover, with Nashoba's closure, local primary care physicians and specialists have lost the ability to obtain diagnostic services like MRIs, CTs, ultrasounds, and simple X-rays. Steward has shown a pathological lack of concern for anyone but themselves.

Steward repeatedly misrepresented or outright falsified information to state regulators, intending to downplay the closure's impact. For instance, when the DPH inquired about transportation options for residents after the hospital's closure, Steward cited a company called "Here to There" Transport LLC that supposedly provides 24/7 transportation. This was presented as if it solved the problem of no public transportation or ride-sharing services in the region. In reality, "Here to There" transport is one woman named Joanne who primarily provides airport transfers—not the solution to our community's healthcare access issues.

Steward portrayed Nashoba as a failing hospital with a declining patient census to justify the closure to the state. However, this narrative conceals the fact that Steward's corporate executives systematically deprived the hospital of essential resources for years, including specialty physicians such as gastroenterologists, general surgeons, urologists, and anesthesiologists. As a result, Nashoba was forced to transfer patients to other hospitals, such as St. Elizabeth's, for care that could no longer be provided locally. What appeared to be a hospital in decline was, in fact, the result of Steward's calculated neglect.

The closure was not because the hospital was failing; it was Steward's failure to support it. Steward's greed is putting lives at risk, and their actions—or lack thereof—will kill people. They have systematically dismantled healthcare in our community, leaving us without the resources to save lives in critical moments. Despite repeated warnings and desperate pleas from healthcare professionals, no one has stepped in to stop them. Steward's unchecked greed has created a healthcare crisis, and if nothing is done, people will die as a result. This is not just a business failure—it's a human tragedy waiting to happen.

---

[SUMMARY STATEMENT OF AUDRA SPRAGUE]

My name is Audra Sprague, I am a registered nurse with 17 years of service at Nashoba Valley Medical Center, I will give testimony regarding what it was like to work in a Steward-owned hospital and the impact the hospital's closure had on our community. My testimony will attribute the closure to the mismanagement and profit-driven strategies of Steward Health Care, which acquired the hospital in 2011. Under Steward's ownership, the hospital's resources were systematically drained.

Steward's cost-cutting measures limited staff's ability to provide care. Essential equipment was neglected or replaced with inadequate substitutes. Maintenance and repairs were postponed, resulting in insufficient medical facilities and increased pressure on the staff. This deterioration was compounded by chronic understaffing, which made basic tasks increasingly difficult and placed a heavy burden on staff.

My testimony will discuss a time when my 18-year-old son was admitted to the emergency department with a life-threatening condition but was forced to remain there due to a lack of available ICU beds. As a result, I had to provide care for my son due to inadequate staffing, instead of being able to provide him support as his mother.

The hospital's closure has had severe repercussions for the surrounding community. Patients now face extended transport times to receive care at distant hospitals, straining local EMS systems and further burdening already overwhelmed healthcare facilities. The loss of Nashoba Valley Medical Center also means that local primary care physicians and specialists have lost a crucial resource for diagnostic services.

My testimony will explain how Steward Health Care provided misleading information to state officials, downplaying the impact of the hospital's closure. The company's portrayal of Nashoba as a failing hospital with a declining patient census was misleading; in reality, the hospital's struggles were a result of Steward's deliberate neglect.

Steward Health Care's pursuit of profit over patient welfare led to the hospital's closure and created a healthcare crisis. The repeated and constant profit driven decisions continue to have life-threatening consequences for my community, creating a grave situation in many communities around the country, all led by corporate greed.

15

The CHAIR. Thank you very much, Ms. Sprague.
Representative Echols. Oh, I'm sorry. Ms. Mitchell.

## STATEMENT OF MAYOR STACI ALBRITTON MITCHELL, WEST MONROE, LA

Ms. MITCHELL. Good morning, Chairman Sanders, Senator Cassidy, and the other Members of the HELP Committee. My name is Staci Albritton Mitchell. I'm the mayor of the city of West Monroe, Louisiana, and as Dr. Cassidy mentioned, I'm also a member of the Community Advisory Board for Glenwood Hospital. And I never expected to be here before in my life, testifying before Congress, but what my community has experienced over the last year, I think is worth your attention.

I appreciate this opportunity to testify on the impacts the Steward Health System has had on our city, West Monroe, as well as the northeast Louisiana region. The city of West Monroe is located in northeast Louisiana. We're home to about 13,000 residents, but our eight-parish region has almost 300,000 residents. West Monroe is the home of Glenwood Regional Medical Center, it is managed by Steward Healthcare. It serves as one of the primary health access points, not only for West Monroe, Ouachita Parish, the eight other parishes I mentioned, as well as it takes transfers from 26 rural hospitals.

During Steward's management, access to emergency care became greatly diminished and at times unavailable. This created a strain on the other healthcare facilities in our region. And when Glenwood was put into immediate jeopardy status in December 2023, patients seeking emergency room services had to be diverted to other facilities 10 to 20 minutes away on the other side of the Ouachita River from West Monroe. And there are reports of these individuals waiting hours upon hours and sometimes days to receive services.

Even with the Glenwood ER open, there kind of became a lack of overall confidence in the care that was provided at Glenwood. And some residents chose to seek services in hospitals even further away, creating, more stress on an already stressful situation and of course, more expense for, kind of an impoverished region. But this also overwhelmed the other hospitals.

While patient care is the priority, Glenwood is also an important economic driver. It is the largest employer in the city of West Monroe and West Ouachita Parish. And before Steward's reductions, there were over 1200 employees at Glenwood, and today there are approximately 750. I can't overstate to you what a closure of Glenwood would do to these employees and their families.

Those who work maintenance and janitorial and clerical type jobs will be affected the most. There's a shortage, of these jobs in our region, and the medical professionals would likely have to go somewhere else. They would have to relocate to find employment, which would also worsen the shortage of professionals and specialists that we have in our area. In addition to the effects on the direct employees, Steward has either not paid or they have delayed paying local vendors.

16

Last November, I was contacted by a local landscaper asking if there was anything that I could do to assist in getting paid. He had been, providing the services but had not been paid in several, several months. I said, "Send it over. Let me see what I can do if I can help." When I got the invoice, I was surprised it was for $72,000. And for a small business with a family and dependents and employees, that's a lot of money and could put them out of business.

Now I want to be clear that the caring employees of Glenwood, they have held that hospital together during challenging times. Their dedication, their commitment to their patients and to our community, is to be commended. And this situation, though, it continues to cause mental and physical stress on them because they don't know if they're going to have a job tomorrow or not, or what conditions they're going to have to work under.

In West Monroe, we welcome outside investment. We know that good healthcare is a must for a region to prosper and Steward's management has had a negative effect on our efforts to attract business residents and industry. It is imperative that when individuals or companies invest in critical infrastructure, such as healthcare, that they do so in a responsible manner, and they have their patients and the well-being of all in mind. And in Steward's case, there was a failure to uphold this responsibility. And you can see the ramifications easy in West Monroe and in these other communities that have Steward-managed hospitals.

I thank you for the opportunity to be here. I also hope that you will be able to do, something will come of this, because I want to ensure that nothing like this happens to another community. Thank you.

[The prepared statement of Ms. Mitchell follows.]

PREPARED STATEMENT OF STACI ALBRITTON MITCHELL

Good morning, Chairman Sanders, Ranking Member Cassidy, and Members of the Senate Health, Education, Labor, and Pensions Committee.

My name is Staci Albritton Mitchell, and I am the Mayor of the city of West Monroe, Louisiana. While I never expected to testify before Congress in my lifetime, I feel that what my community has experienced over the last year is worth your attention. I appreciate the opportunity to be here today to testify on the impacts the Steward Health System has had on the City and the greater region.

For background, the city of West Monroe is located in northeast Louisiana and has a population of 13,000. This region is home to almost 300,000 residents. West Monroe is the home of Glenwood Regional Medical Center, which is managed by Steward and serves as the primary health access point for the residents of West Monroe, as well as Ouachita parish and 8 other surrounding Parishes. Glenwood accepts transfers from 26 rural hospitals in Northeast Louisiana. Glenwood was originally established in the 1960's. It was purchased by Steward Health in 2017 and has been under Steward's management since then.

I mentioned before that Glenwood is a primary access point for almost 300,000 people, many of whom have been put at risk in the last year because of Steward's management. During Steward's management of Glenwood access to crucial emergency care became greatly diminished and at times unavailable, creating a strain on other healthcare facilities in the region. When Glenwood was put into "Immediate Jeopardy" status in December 2023 patients seeking emergency room services had to be diverted to facilities located across the river, up to 10 to 20 minutes further, such as Saint Francis Medical Center or Ochsner Hospital, quickly leading to severe overcrowding at these other facilities. There are reports of individuals having to wait hours and even days to receive services.

17

Further, even with the ER open, these self-inflicted service reductions led some people to a lack of overall trust in the community for the care provided by Glenwood. Some Northeast Louisiana residents are choosing to seek services further away, enduring increased travel and expenses in a rural, impoverished region, which further stresses other hospitals.

While patient care is the priority, Glenwood is also an important economic driver. Glenwood is the largest employer in the city of West Monroe and West Ouachita Parish. Before Steward's service reductions there were over 1200 employees at Glenwood. Today there are approximately 750 employees.

I can't overstate what a closure of Glenwood would do to these employees and their families. Those who work maintenance, janitorial and clerical type jobs will be affected the most because of the lack of those types of jobs in the region. The medical professionals would likely need to relocate to find new employment, which would worsen an already dire shortage of these professionals in the area.

In addition to the effects on its direct employees, Steward has either not paid or delayed paying local vendors. As an example, last November I was contacted by a local landscaping company asking for assistance dealing with Steward on an unpaid invoice. The business owner was contracted with Steward to provide landscaping services and had been faithfully fulfilling his duties under the contract. Steward, on the other hand, failed for several months to provide any payment for these services. I was provided the unfulfilled invoice for $72,000. While the invoice was eventually paid, a rural small business with employees and dependent families can be forced to shut down for an unpaid invoice of that size.

I want to be clear that the caring employees of Glenwood have held the hospital together under extremely challenging conditions. Glenwood employees should be commended for their dedication to their patients and our community. This situation continues to cause mental, emotional and physical stress on these employees not knowing if they are going to have a job tomorrow.

West Monroe welcomes and encourages outside investment into our community. Accessibility to good health care is imperative for a region to prosper. Steward's management of Glenwood is having a negative effect on our efforts to attract new business, industry and residents to our region.

It is imperative that when individuals or companies invest in critical infrastructure, such as health systems, that they do so in a responsible manner with the health and well-being of all who are dependent on services in mind. In Steward's case, there was a failure to uphold this responsibility, and the various ramifications of that failure are easily seen within West Monroe and the other communities across the Nation that were impacted by Steward hospitals. I want to ensure that other communities don't have to go through this.

Again, I appreciate the opportunity to participate in today's hearing and am happy to answer any questions you may have.

The CHAIR. Mayor Mitchell, thank you very much.
Representative Echols.

## STATEMENT OF REP. MICHAEL CHARLES ECHOLS, LOUISIANA HOUSE OF REPRESENTATIVES, MONROE, LA

Mr. ECHOLS. Thank you, Senator Sanders, Senator Cassidy, and panel. Today is a very important step in holding those accountable in this healthcare delivery system that continue to rob from all of us across America. Only you at the Federal level can make this happen. I'm going to highlight some of the hearing that we had in Baton Rouge.

After a year and a half of hearing from local physicians, nurses, and other providers that there was a problem, we started to see service lines being cut for delivery in Northeast Louisiana from intensive services, urologic care, all the way down to basic MRI diagnostics. Physicians called me highly alarmed that they were unable to deliver quality care, which they're used to being able to give by having the resources.

18

After about 6 months of hearing many of these stories, as a legislator, I felt inclined on the Health and Welfare Committee, that we needed to have a hearing and have a broader discussion with the local management, which are essentially Steward hired executives that they brought in. On April the 9th, I had a hearing. Now this is after the facility had been placed in medical jeopardy numerous times, numerous conversations with our Louisiana Department of Health, at the time, Stephen Russo was the legal counsel there working as executive counsel in conjunction with all the other leadership at LDH. We summoned the interim president and CEO Jon Turton to a committee meeting along with community members, much like you've done from across America today.

In that hearing we heard impact from other regional hospitals on how they had to pick up the load when Steward and Glenwood were unable to keep up with the patient volume, they cut their numbers by two-thirds. They testified to the fact that it was tens of millions of dollars in additional costs that they were not able to recoup. They even did service lines for Glenwood. St. Francis Hospital, one of the regional hospitals, which up until the day of the hearing had not been paid for MRI services that they were helping out this other regional hospital.

LDH testified that they didn't have supplies on hand. And when they came in and put them under medical jeopardy all the way down to basic $1, $2 supplies, things that you need for surgical care, were not on hand and patients there ended up getting hurt because of that. Several members of staff told me about infections that happened with patients and patients dying because of the lack of those supplies.

All this led up to this hearing where when we deposed Mr. Turton, the interim CEO, he admitted on the record that Steward was solely responsible for not providing the financial resources that they needed to provide adequate care to that hospital. He also, on the record, noted that because of their mismanagement, they killed and maimed patients. When that interim leader, the Steward hired executive, admits that on the record, we have a substantial problem.

When I hear my colleagues from across America here to talk about these deficiencies in the healthcare system, it is glowingly clear to me that the executives of Steward Health Group are healthcare terrorists. They are killing our patients, they're killing our communities, and they need to be held accountable.

I think the problem is broader. Senator Sanders, you mentioned at the beginning of the hearing that there are other organizations involved. Medical Properties Trust coupled with Steward, have facilitated a Ponzi like scheme, that to me, has to be held accountable as well. Funneling billions of dollars through private equity into these healthcare delivery systems are creating criminal enterprises.

I'm hopeful that this Committee, after this subpoena of the CEO, who no-showed, can hold him accountable, put him in jail, because that's where he deserves to be for stealing this money from all of our communities. Glenwood and its employees and the people on the ground are terrific people. They've done everything in their

19

power to make sure that the patients get everything they can, but their hands have been just completely tied.

This has created a massive imbalance in our healthcare delivery system in northeast Louisiana. We're trying to keep the pieces together, but I do want to make sure, and after this panel is over, that organizations like Medical Properties Trust cannot continue to fund other bad actors who are going to come right after Steward, because this isn't the only game in town.

They've got people they've worked with for decades that they'll fund. They'll come in and have the same mismanagement. So, I'm hopeful that this Committee, whether through new laws or through some form of oversight, can make sure that imbalance gets rebalanced, and we put logic and reason back in the healthcare delivery system.

Thank you for your time and attention. I'd be happy to answer any questions.

[The prepared statement of Mr. Echols follows.]

PREPARED STATEMENT OF MICHAEL ECHOLS

Thank you for the opportunity to allow me to testify before your esteem Committee. The issue with Steward Health Group and Glenwood Regional Medical Center has created an imbalance in Northeast Louisiana and the healthcare delivery system. I have over the last year and a half seen the dramatic impact to patient care as well as the imbalance in the delivery system for rural hospitals because of Stewards negligence and malfeasance. After visiting with local physicians and patients it was alerted to me that there were major problems at Glenwood Hospital. The physicians had deep concerns about the lack of supplies, leadership issues, and other bad decisions that were being made by executives of Stuart health group who manage Glenwood Regional Medical Center and how it was impacting their ability to care for patients. Soon after these anomalies started being presented by physicians, Glenwood Regional Medical Center started to eliminate service lines such as labor and delivery, urologic care, major diagnostics such as MRI as well as other specialist services because of this mismanagement.

As a legislator I was inclined to have a hearing to discuss many of these issues in a public forum to allow individuals to express their concerns both the public as well as providers in the medical community. Prior to having a public hearing I was able to meet with Louisiana Department Of Health representatives such as Stephen Russo, who at the time was the Executive Counsel of LDH. There were numerous communications with them who in turn communicated with the Glenwood leadership team as well as Stuart exec at the time. You could easily determine that something was wrong after several months of back-and-forth and reading national publications about Stewards mismanagement and other markets. It was abundantly clear that there was a problem at Glenwood with many of the service lines being shut down, quality issues being reported other hospitals reporting issues with Glenwood.

After several months and transition of state administration for the department of health who took over soon after the January 2024 inauguration it was apparent Gelenwood and Stewart had transitioned from a series of small problems to major problems being placed on jeopardy status with the state and having their Medicare and Medicaid licensures in jeopardy at the Federal level. There were numerous accounts patient care was being compromised due to material shortages, no specialist care due to physicians was being paid and reports of patients being hurt or even dying because of not getting the care that they deserved or needed.

Due to all these reports of Stewart's negligence and gross malfeasance some weeks later I was able to establish a commission committee to meet and report from the community on April 9 of 2024 at the Louisiana legislature the Subcommittee of Health and Welfare was able to meet and receive testimony from community members.

Nurse practitioners, nurses, doctors regional hospital executives from St. Francis members from the LDH or the department of health executive team all presented what the impact was of Stuart mismanagement corporate malfeasances and non-investment in the property in Northeast Louisiana.

That hearing was revealing and that the president or CEO of Glenwood Jo Turton arrived and testified on behalf of Glenwood and Stuart in the audience, Mr. Puddy a southeast regional vice president of Steward was present as a legal council, but refused to testify. He was to come to the table but again he was scared and did not come to the table. Mr. Turton and his testimony validated that Steward was negligent as well as liable for not providing supplies, not paying vendors, not having a fiscal management and killing or maiming patients to which he admitted all these things on the record.

This testimony alone which can be found online is reason to hold Steward liable and corporately negligent for killing and/or maiming patients in Northeast Louisiana due to the fact that Steward and the greedy team of executives who stole money through whatever means possible in conjunction with Medical Properties Trust unjustly enriched themselves versus reinvesting back in provider pay vendor payments, and patient care.

All these things have created a massive imbalance in Northeast Louisiana healthcare delivery market. I hope that this Senate panel will be willing to hold these executives these corporate raiders who work between Medical Properties Trust as a quasi Ponzi scheme to acquire hospitals, distribute short term profits from over valuations and hold assets in a REIT thus separating ownership from operators in order to rape the healthcare delivery system and pillage the assets while holding them hostage through funny bankruptcy laws and a real estate investment trust that has no accountability to the community to hold an asset hostage. Steward and Medical Properties Trust has done this in numerous communities, asked for political bail outs and continue their Ponzi like scheme. These schemes persist and I'm hopeful the SEC will investigate MPT further along with the symbiotic relationship of the CEO of Steward and MPT. These two have scheduled to loot hundreds of millions of dollars through financial relationships while leaving patients to die on the table waiting to care.

I'm here today to answer any questions to reflect on the hearing that was held on April 9, 2024 in Baton Rouge. Thank you for your time.

———

The CHAIR. Thank you very much, Representative, and thank you for your work in being here today.

Senator Cassidy, what comes to my mind above and beyond the discussion we're having, Massachusetts is supposedly one of the progressive states, Louisiana, one of the conservative states, and we're hearing the same story, aren't we? We're hearing about decent, hardworking healthcare workers trying to maintain a rotten system based on outrageous greed. We're hearing communities being impacted whether Louisiana or Massachusetts, and we're seeing that all over the country.

I want to pick up on a point that every one of you made, and that is the spillover impact that the collapse of a healthcare facility has on other facilities in the region. In Vermont, Massachusetts, Louisiana, we're all stressed in healthcare. If a system closes down, if a hospital closes down, it's not like, "Hey, no problem. Other people will pick it up." So maybe just go right down the list. Mayor, do you want to start off? In your community, what is the impact on other facilities?

Ms. MITCHELL. Well, definitely the other two facilities in Ouachita Parish are overwhelmed. The ERs are full. The beds are full. So not only are the patients having to wait, but the employees that work there are stressed. They're overwhelmed.

The CHAIR. Say a word on that. And maybe somebody else, all of you mentioned this in one way or another. You have decent people. I'm always amazed. I have to tell you, I have had nurses in tears in my office, not worrying about their wages, but broken hearted that they cannot provide the quality of care they have been

21

trained and want to do. And what I'm hearing from all four of you is you have great workers, stressed out, overwhelmed. Who wants to talk about the impact of what Steward has done on the employees of the various facilities? Anyone want to jump in?

Ms. Sprague.

Ms. SPRAGUE. Hi. Thank you.

The CHAIR. Talk a little bit closer to the mic.

Ms. SPRAGUE. Yes. The impact for the healthcare workers, nurses, doctors, everybody, is you go there and you become for—I can speak as a nurse—you want to take care of people, you want to help people. Nobody's working this hard in this situation for any other reason. And when you have—in the emergency department where I worked—you have sick critical patients and not enough physical people to take care of them all, you have to go to the most emergent situation.

Which means that there's some poor little elderly woman in her bed that's in pain, that's not getting her pain medication or, incontinent and needs to be cleaned up. And in the back of your head, that needs to be done, but you can't physically get there and there's not a physical time to do it. And that those are the things that keep you up at night that you worry, you're like, "Oh my God, that poor woman." And it wasn't that you didn't want to, you just physically could not get to it because of the life-threatening things or the urgent things you have to prioritize.

It was everywhere at every level. Everybody was trying to make up for what Steward wasn't putting in and wasn't investing. We had to invest with our own work.

The CHAIR. I'm hearing that there has been enormous emotional toll on people who see suffering, who want to address it and are unable to do so.

Ms. SPRAGUE. Yes. Yes.

The CHAIR. Not to mention, one of you mentioned people actually taking money out of their own pockets to buy necessities. Ms. MacInnis, did you want to add to that or?

Ms. MACINNIS. Thank you, Senator Sanders. I have spent the past 12 years since we realized—it took us a little bit of time to realize what a bad player Steward was—and I've spent countless hours sitting across the table from Steward at least twice a month at staffing and labor management meetings and saying, "This is unsafe. This is untenable. We can't do this."

We represent hundreds of nurses who just sometimes struggle to come into work, to put one foot in front of another. It ruins you. A lot of people who used to work full time, 36 hours a week, cut down their hours. Now when people are that stressed, they just, they cut down their hours and they just don't feel like they can do it anymore. It's the moral injury that occurs when you're unable to do the one and only thing you want to do. And that's to keep patients safe and to take care of the best care that you can of a patient of all my patients.

But for the greed of Steward in the way they deliberately, and it almost feels malicious, deprive me of my colleagues, my support system, my supplies, my equipment. I'm just worn out.

22

The CHAIR. Thank you.

Senator Cassidy.

Senator CASSIDY. I would defer to Senator Romney.

Senator ROMNEY. Thank you, Mr. Chairman, and Ranking Member Cassidy. Appreciate the testimony we've heard and your willingness to bring this to our attention in a very clear and convincing way. Obviously, the events that took place under Mr. de la Torre's management at Glenwood and other facilities across the country, including by the way, five hospitals in Utah, was reprehensible and never should have happened.

Steward was operating in my state from 2017 to 2023. They understaffed healthcare facilities. They didn't pay for required medical equipment. They failed to meet minimum operating standards. They refused to pay a number of vendors to the tune of about $40 million to vendors in my state, and most importantly, they endangered lives. And it's hard to calculate precisely how many lives have been seriously affected or worse as a result of their mismanagement.

Clearly this kind of unusual setting warrants careful and thorough Federal review. HHS at the Federal level is responsible for conducting oversight to combat waste, fraud, and abuse. It appears that all three were involved at Steward. And I appreciate Chairman Sanders and Ranking Member Cassidy for bringing the issue before our Committee, but I regret we don't have someone here from the Administration either this Administration or the prior Administration to talk about, Okay, what should HHS be doing? How can we oversee, particularly in the case of hospitals in rural areas, that this doesn't happen? And, is there something that needs to be done at the Federal level to make sure that levels of care are being provided? Is there something done at the state level?

Now, I'll turn to you Representative, which is, what is, what happens at the state level? Is there some state oversight where state regulators lack in this regard? I don't know, to what degree the Federal regulators should have been taking more aggressive action or whether they had the authorities necessary to do that. But from your perspective, is there something that the state can do or should do or did not do that would've prevented either the tragedies in your state or perhaps in other states like mine that had been so gravely affected as well?

Mr. ECHOLS. At the time—and thank you for the question, Senator—the undersecretary, the secretary of LDH started investigating in November 2023, which led us up to the hearing in spring of 2024. They do have, through the medical jeopardy process the ability to suspend or terminate the license for the facility. And that's the path we were headed down with this particular situation.

Some states are more aggressive than others. I mean, when you look at shutting down a hospital and potentially hurting more people because of that, this is how both private equity and these facilities get away with these schemes, because they put your facility in jeopardy, they shut them down, your community has nothing. So, they suffer even more. So, then they can come to politicians like

23

you and me and ask for additional bailout money and other life-lines, which to me is part of the broader crime.

To answer your question, yes, there are pathways for our departments of health to hold them accountable, but the question is, is the pain worth more than the punishment?

Senator ROMNEY. Do you believe that additional Federal oversight is important or necessary in this regard?

Mr. ECHOLS. I think more broadly, when you look at how these schemes are funded, they come through—and Senator Sanders mentioned Medical Properties Trust—when they're fueling this private equity movement to be able to fund these schemes, then yes, there's Federal oversight. And it starts with the SEC. I'm shocked that a real estate investment trust can have such large ownership of a company like Steward. That's not how REITs function. Federal laws should prohibit those things.

There's a broader conversation on how you fund it. And then there's, maybe a less broad conversation around specifically with the Department of Health and Hospitals on regulatory environments that disallowed these types of operations to exist.

Senator ROMNEY. Great, thank you.

Mr. Chairman.

The CHAIR. Thank you.

Senator Markey.

Senator MARKEY. Thank you, Mr. Chairman, very much. Behind me are pictures from the patients who died at Steward Hospitals in Massachusetts when Steward directed millions, tens of millions, hundreds of millions of dollars away from paying their bills and into the pockets of corporate executives. Ralph de La Torre, Cerberus, Medical Properties Trust were just sucking out tens, hundreds of millions of dollars for their own benefit and leaving these hospitals without the resources which they need.

Dirty ICUs, patients are bleeding out, they're dying in the hallway. Sunita, Theresa, Gilberto, David, Patsy, Michael, they were amongst the patients that our nurses were just referring to. And God knows how many others, whose names we don't even know. We know that more than 2000 patients were endangered by Steward Healthcare according to *The Boston Globe* Spotlight team. They were grandparents, parents, children, aunts, uncles, nephews, nieces, friends, community members.

But for those corporations, private equity, those profits came first, meaning the patients came last and ultimately just left it to the nurses to try to deal with this situation as it unfolded. And this was a situation where every patient meant something special to the families and to the nurses as they tried to help.

Ms. MacInnis, you saw the faces of these patients. Can you talk about——

Ms. MACINNIS. Yes, I saw——

Senator MARKEY. Can you talk about these people and their families and what the impact on them was?

Ms. MACINNIS. Patients die and patients become less well sometimes when they empty the—when they enter the hospital, and it's

24

inevitable and that's life. When a patient becomes less well or they die because the resources that they need were unavailable, that's greed. And when I think back over the years of the patients I was unable to care for in the emergency department, because one of the cardinal rules at Steward is you can never decline a transfer.

You might not have a bed in the hospital. You might have a 28-bed emergency department with five nurses and 35 patients. And when you get that call that a critically ill patient is coming, and you say, "I can't. I can't possibly prepare for or care for that patient." The nursing supervisor says, "Well, I'm not allowed to say no, so neither are you." And then you get that patient, and it's a gut punch to know that you won't be able to do for that patient what you know that patient needs.

Time and time again my organization—I personally, I've been to Beacon Hill. I've talked with people from DPH, EOHHS. We've reported power outages and other failures. They closed the ICU at— Steward closed the ICU mid-COVID at Nashoba Valley. And when the MNA reported them for closing it, the DPH called corporate and corporate said, "Oh, no, no, no, no, no. RIC was open. Not to worry." Even though it was dark in there, and there were no patients, and there were wires hanging out of the wall from where the equipment had been removed.

When the MNA called DPH and said, "Well, what did you find?" They said, "No, it's open. Steward said, it's open." So, then pictures were sent to DPH and said, this is clearly a closed unit. And DPH did nothing. DPH is a toothless tiger, and that's why we need this to be fixed at the Federal level. Every single entity that was closed in Massachusetts by Steward was deemed an essential service. And DPH said, "No, no, no, no, no, no, it's essential. You can't close that." And then they closed it anyway, and there were no ramifications. Nothing happens.

Senator MARKEY. What would you have done with the $800 million that Cerberus took out of the system? What would you have done with the $40 million that Ralph de la Torre used to buy his own private yacht? What could you have done with those revenues?

Ms. MACINNIS. We could have had beds that work. I mean, I work on the 10th floor of a building. There is supposed to be six elevators. One of them is working, a single elevator is working. They gave us these sleds, so we're supposed to do a lateral transfer, if there's a fire in the building, you go to the next building. And they gave us these sleds to drag patients who can't walk.

I'm 65 years old. Do you think for 1 minute I can haul a patient on a flight of stairs on a sled? This is lunacy. Six elevators and only one of the—and even that one works most of the time. So yes, if we had that money, we'd have a facility that's clean and where things function. We'd have beds for patients, we'd have stretchers, we'd have food, diapers——

Ms. SPRAGUE. Staff.

Ms. MACINNIS. Staff. All roads lead to staffing. If we had enough staff, we could make do with missing some other things. But for every person you take away from the bedside, you increase the risk to the patient who's left without care.

25

Senator MARKEY. Thank you for being here today. You are brave. And Dr. de la Torre is a coward.

Ms. MacINNIS. Absolutely.

Senator MARKEY. He would not come here to allow you to confront him with the reality of what he has left as his legacy at these hospitals.

Ms. MacINNIS. Thank you.

The CHAIR. Senator Markey, thank you.

Senator Cassidy.

Senator CASSIDY. I'll defer to Senator Braun.

Senator BRAUN. Thank you, Mr. Chairman, and Senator Cassidy. This is just another egregious example of a broken healthcare system, when you can have a story like this. I just spent time with someone yesterday, and this was on an ERISA plan. I think the claim was about 4.2 million that the company had to end up paying the provider 875,000 bucks. And then the insurance companies and another middleman in it got nearly $3 million. And the owner ERISA plan had to end up paying that bill, didn't have enough transparency to actually make a decision that would've prevented it in the first place. And, who was suing the provider that only got 875,000 bucks and the insurance company's other middleman got over 3 million.

That should never be happening in a system. I fought it my entire career as someone wanting to offer great health insurance, took it on back 16 years ago. Proudest thing that I did was created healthcare consumers out of my employees. Didn't think that was reasonable to have your bill, your health insurance go up 5 to 10 percent each year and be told you're lucky. This is part of a broken healthcare system that even doctors and nurses and independent pharmacists don't want to get into anymore because it's been taken over.

When private equity gets into emergency rooms and gets into something, that's because it's easy cash-flow. That's Okay if you want to do it on something that isn't critical, if the marketplace allows it. Here, it ends up in a story like this. It ends up to where we're paying twice as much as most other countries are for healthcare. And in many cases we have poorer results. I give you that description of another aspect of the system that I just described. Look at how many resources are being wasted. And then you look at this egregious example, something's got to give.

Senator Sanders and I have put out a template based upon competition and transparency, getting rid of the barriers to entry. It would be a far bigger reform of a broken industry than what government has attempted to do in the past. And I think it ought to put the industry on notice, from insurance companies to hospitals, to the whole gamut. The only ones not liking the system or the practitioners that live within it and they're not happy about how it's evolved, is we have to do something to fix it from the ground up, or we're going to hear more of these tragic stories.

I got a question here. I'm going to ask it let me get to it here. It'll be for Mayor Mitchell. Told you about the bill we've got that's going to create strong transparency. It's going to engender competi-

tion. It's going to try to chip away at this story and others, and there's so many of them that make you sick. I'm wondering if greater transparency would've been helpful in the fiscal condition of Glenwood Regional. If there was more information for people to see out there, do you think it would've made it an easier navigation in terms of what you had to go through?

Ms. MITCHELL. Yes, I think so. And thank you for the question. Even now, as a board member, I mean, we didn't know it. It was always presented that Glenwood was profitable. It was actually one of the most profitable hospitals in the Steward system. We didn't even know. And there were rumors kind of in town, maybe the summer, late summer of 2023, about some local vendors not being paid or being slow to be paid.

But it really was not until September and October when it, the realization of the seriousness of the issue came about. And then all of a sudden, I mean, we were in immediate jeopardy in December. And at that point there was, not a whole lot that could be done on the local end of it.

I've been mayor 6 years. This is by far the No. 1 topic that I get calls, comments, texts, people I don't know stop me in the grocery store asking, "Please do something about this." And it just all came to head kind of just all of a sudden. So, transparency would definitely, I think, help the situation.

Senator BRAUN. I think until healthcare consumers who have atrophied within a broken system that many times are fearful that their own insurance plan is going to be there for them after they get the bill four to 5 months later, it's all got to change.

Ms. MITCHELL. Agreed.

Senator BRAUN. If it's not involved with an engaged skin-in-the-game consumer and a system that if they want to call themselves free enterprise has to start responding. Otherwise, you're going to see this egregious issue, many others like I described. And then yes, a system that could still be repaired will have to be run like every other country does it. Industry wake up. Thank you.

Ms. MITCHELL. Thank you.

The CHAIR. Thank you very much.

Senator Hassan.

Senator HASSAN. Thank you, Mr. Chairman, and Ranking Member Cassidy for holding this hearing. Before we begin, it's absolutely unacceptable that Dr. de la Torre has defied a subpoena from this Committee and isn't at today's hearing. The American people deserve to hear answers directly from him on the horrific mismanagement of Steward Healthcare.

Ms. Sprague and to all the witnesses, thank you for being here. To our nurses in particular, thank you for what you have done throughout your professional careers. Nurses keep our healthcare system going and they save patients every day and they comfort patients every day. And we are very, very grateful to you.

Ms. Sprague, I want to discuss your experience at Nashoba Valley Medical Center, which is located in Massachusetts just about 10 miles from the New Hampshire border. And Southern New Hampshire Medical Center in Nashua about 18 miles away, is like-

27

ly to be one of the healthcare facilities that now has to absorb the impact of the closing at Nashoba Valley.

When Nashoba Valley Medical Center announced abruptly at the end of July, that it would be closing in August, leaving just a month for patients and staff to prepare for this massive change in their community, I am curious about what patients and staff at Nashoba were told in the weeks leading up to that closure.

Ms. SPRAGUE. From Steward Corporate, very little. We got the WARN notice that was sent to the MNA that wasn't sent directly to each of the employees because they don't have to if you're a part of the union. So that's how the notification came of the closure to begin with. That was on July 26th. On August 2nd, so 5 days later we got—well, five business days, so a full week later—we got the first email from corporate Octavia Diaz that said, pretty much, "I'm sorry. Like, we tried, but we're going to close anyways. It's not our fault. Nobody bid." Which everything was done in complete secrecy.

They kept saying no viable bids. But nobody knows what that means or what that entails. And they just closed. We had a town hall meeting, which is like a—we did it by phone with our CEO, but even they weren't given a ton of information from corporate. And that's it. We never had another interaction from corporate to all of the employees, like that was sent to us. Everything's closed now.

Some of the doctors have left, like the specialists, the endocrinologists have left. I know about it because I work in the hospital and I know like what's going on as being part of one of the co-chairs of the union. But I have never gotten a letter from the hospital saying that there's no longer a diabetes and endocrine center. So a lot of people don't know.

I know that there's nothing in check for them and how they got here, I don't understand because if I don't do my job, there is a very strict system that will pluck me out of practice to keep patients safe. So how private equity comes in and just can do all of this to all of these people with no systems in place, it's crazy to me.

Senator HASSAN. Right. Because patients are going to have to travel farther——

Ms. SPRAGUE. Much farther.

Senator HASSAN [continuing]. To receive care in our region. It puts a massive strain on nearby hospitals and local EMS, including as I pointed out in my state. Can you speak just briefly—I want to ask you two things. Talk to me about the impact that you have seen or you're hearing from your colleagues in the nursing profession on other hospitals in the region as they have to work to absorb hundreds of patients from Nashoba. And then also, I understand that you all tried to push back and protest the closing. And I'm curious about how Steward responded to that.

Ms. SPRAGUE. Steward had no response to it at all. We never heard anything from them. They just went on with their day. And because they don't think that they care at all. It was of no consequence to them of what they were doing to every employee and every person that gets care at our facility, how it was at every level going to affect them. And people had no transportation, no way to

28

get there. They had no knowledge of it. And I guess there's some helpline that's set up for, I don't know, a few hours a day, but I'm sure it's wholly inadequate if Steward is in charge of setting it up, and they just had no help and no time, because they wanted to get it done in 30 days, because then it's less debt, less money that they have to spend to keep this hospital open.

There was no time to increase the staffing. For all the EMS, all the towns, most of them have one or two, ambulances aren't staffed. Now their transport times are double, triple to get someplace where they're out of service much longer. Meaning that there's not another ambulance crew available for the people in that town. And most of them are also the firefighters. So now you don't have firefighters in town for that. And the other hospitals around are having to absorb the patients.

Then as the employees who have lost our jobs, now we have to go work in that setting where they're overwhelmed because now far can we go when we're not going to drive hours and hours to go where these hospitals aren't affected. So now I have to go work in an emergency department if I want to stay an ER nurse, which I do, that's more overwhelmed than it was before. And so, it's just so multi-layered, and it's things you don't even think of. You're like, "Oh my gosh." Even a month later, I'm like, "I didn't even think of that."

They don't care that nobody in our area, 16 communities that are serviced, they have literally nowhere to go and it will cost lives. And they know the state and they know it's wrong, and they know that Steward lied about everything always. And they still got to just do whatever they wanted. I don't understand it.

Senator HASSAN. Well, thank you. I'm over time. I want to just comment to Ms. MacInnis. I had a question about how things have changed at St. Elizabeth's, and you've already answered that multiple times. But Mr. Chairman, as somebody with family in the Boston area, I just want to say that St. Elizabeth used to have a reputation as being a wonderful, wonderful hospital, especially for moms and babies. And to hear your stories shakes me to my core. And I thank you for being willing to share it. I thank all of the panelists for being able to, as Senator Markey pointed out, be brave enough to be here today when the person who should be here today is not. Thank you.

Ms. MACINNIS. Thank you, Senator.

The CHAIR. Thank you, Senator Hassan.

Senator Cassidy.

Senator CASSIDY. Hey, Mayor Mitchell and Representative Echols, I want to enter into a conversation with you.

Mayor Mitchell, you were on the community board. Did they ever show you financials?

Ms. MITCHELL. Financials were passed out each month. I'm not an expert in healthcare finance, but they were passed out every month. And it did show that the hospital was profitable.

Senator CASSIDY. Now was it profitable on a margin? Was it profitable like, "Oh my gosh, you got some operating capital here?"

Ms. MITCHELL. It was, I think, more marginal.

29

Senator CASSIDY. Now I'm struck, and this may be for Mr. Echols, but we are hearing that they never went on divert in Massachusetts, that they would accept a patient for transfer even if they didn't have a bed.

Ms. MACINNIS. That's correct. Yes.

Senator CASSIDY. But it took our health and hospitals to make them limit their—now I'm a physician. I know that's because you didn't have staffing. If you don't have staffing, but you're still taking patients, then you're putting the patient in danger. I'm just going to say that.

Did they ever discuss why they would not limit their number of beds without the state making them do so? Because presumably staffing had become an issue and that's why the state limited it.

Ms. MITCHELL. When I first called LDH, which would've been probably late October, December, or November, telling them we need help, I was told it was a private industry, private business, free enterprise, and until certain types of complaints were made, that there really wasn't a lot that could be done. An extremely helpless situation knowing that, things were not great in the hospital. And it took, I think, a different type of complaint. I think a patient or maybe a physician made a complaint to LDH and it took that to get LDH to send surveyors to Glenwood to assess the situation.

Senator CASSIDY. The specific complaint was about staffing ratios, regarding the paucity of equipment? Tell me.

Ms. MITCHELL. I think it was more about the lack of supplies.

Senator CASSIDY. Lack of supplies. Now Representative Echols, one of the things I'm interested in, is a lease arrangement between Medical Properties Trust and the hospital. And I think you've reviewed some legal proceedings which have taken that, which would otherwise be proprietary and has now become public. Were there market rates being paid for the lease, or were there above market rates? Can you give us a sense, because I'm trying to—where is the hole in the bottom of the bucket? They're making money even on the margin, and yet there's some hole where the money's dripping out.

Mr. ECHOLS. I think it all starts at the top. So, as I understand it and was reported by the Department of Health, that the lease between Steward and Medical Properties Trust was equivalent to $10 million a year. So, a property like Glenwood, $10 million a new year is an enormous amount of money.

Senator CASSIDY. Is that market rate or is that above market rate?

Mr. ECHOLS. It's above market rate.

Senator CASSIDY. Do you have any sense, is it marginally above, 10x above? Are you seeing what I'm saying?

Mr. ECHOLS. I think it's at least 2x.

Senator CASSIDY. 2x.

Mr. ECHOLS. That's on the high end. $5 million a year would be a high lease for that type of property with a deferred maintenance and other issues. Steward, which is of course responsible when a

30

REIT owns an asset, the lessor, whoever's leasing the building, would typically be in charge of making improvements to physical plant. They have to keep that for their SEC rules.

In this case, they should have been investing back in the hospital. There's tens of millions of dollars of deferred maintenance in that facility.

Senator CASSIDY. Let me stop you for a second, because in our investigation, it looks like MPT has for Steward in general, has through forbearance of loans or just cash, returned about $200 million to the system. I'm trying to be impartial here. I'm trying to figure out what's actually going on. So, you could argue that they were putting the money back in the system to try and float the boat. But Mayor Mitchell, was there any—could you see from the community board, or Representative Echols from your investigation, that any of this money was put back into that deferred maintenance et cetera?

Ms. MITCHELL. No. You could walk in the medical mall or the hospital now, and there'll be buckets—especially with the rain that's come through the last couple of days—there'll be buckets in the hallway catching water because of the leaks. I was in the medical mall last week and you had to walk around, things like that to get to the facility where I needed to get a test.

Mr. ECHOLS. Steward executives required employees, PTs, doctors, nurses to go around and cleanup the hospital, physically cleanup, sweep, mop to try to prepare for this next round of liquidation, I guess, as they're bringing in suitors to try to take over this lease.

Senator CASSIDY. Let me stop you because I just have seconds left.

The CHAIR. You got time.

Senator CASSIDY. I keep on hearing corporate, corporate, corporate. Am I gathering that local decision-making, that you couldn't say, "By the way that we need another coil to embolize a bleeding adenoma in the liver." You had to go to corporate to get them to pay for that. So, Mayor Mitchell, again, you're on the Community Advisory Board, is our impression correct that local decisions had to be made corporately?

Ms. MITCHELL. Yes. And so many of the different departments got moved out of the hospital. So it was even harder to get a decision or to get a response or a decision or to get anything done.

Senator CASSIDY. What was the means of communication? Was it a kind of formal discussion, listen, here's our to-do list and here's our needs list, or was it more ad hoc?

Ms. MITCHELL. It was really more ad hoc. I mean, the community advisory board, I mean, we were not in the day-to-day operations, obviously we're not in those decisions. It was more of a here's what's going on in the hospital type situation.

Senator CASSIDY. Well, I'm going to—the Chairman has generously allowed me to go a little bit over. But before I end, I want to thank the nurses. I used to work in a hospital, which was publicly run and always at the end of the fiscal year, we didn't have money for things, but it was the committed staff that made it work.

31

And I just like my heart's beating with yours on everything you've done.

Thank y'all. Thank y'all.

The CHAIR. Thank you, Senator Cassidy.

Senator Hickenlooper.

Senator HICKENLOOPER. Thank you, Mr. Chairman. First do no harm. That's connected to the Hippocratic Oath. And Dr. de la Torre went to medical school, became a doctor. I mean, it raises the question, how can he be Okay with the business decisions he made and how can he stand behind them? Thousands of workers laid off because of Dr. de la Torre's shoddy business practices and mismanagement of Steward Health's hospitals and closures.

Four hospitals in Massachusetts alone laying off 2,500 employees. And at a time when we're so worried about healthcare employees, we're somewhere in the vicinity as many as 6.5 million could leave the profession by 2026, by the end of 2026. And we have in the best, most of optimistic pipeline, a couple million to replace them. And I think that gross mismanagement is not only impacting current workers lives, but it's also affecting future potential workers, young people that would have considered going into this.

Ms. MacInnis and Ms. Sprague, how do we go about battling back? How do we re-institute the efforts to inspire high school students who might be interested in science or open to medicine to get them to go into healthcare even in what appears to be such an unstable environment, and within Massachusetts obviously, it's going to be a distraction and a deterrent for young people to get into healthcare.

Ms. MACINNIS. I'd like to respond, if I may. We need legislation. We need safe patient staffing legislation. We need safe patient handling legislation. So, the equipment is always available to move patients around. And we need safe environment legislation that would make it a crime to harm a medical worker. I worked 20 years in the ER, I have lost count of the number of times I've been assaulted.

Ms. SPRAGUE. Absolutely.

Ms. MACINNIS. We just don't have access to lifting equipment. And any time a nurse takes care of more than four patients on a med surg unit, the odds of one of those patients dying increases by 7 percent. We cannot keep doing this. Five and six and seven patients, you cannot give good care. All the scientific evidence is four patients is doable. As long as we are bringing new nurses into this environment and OTs and PTs, and we're making them care for too many patients, they're going to turn around and they're going to leave.

Nobody's going to stay and work in this environment. The Commonwealth in Massachusetts, we have 20,001 nurses now than we did at the beginning of COVID. Just to be clear, there is no nursing shortage in the Commonwealth in Massachusetts. There is a shortage of nurses who want to work in unsafe situations.

Ms. SPRAGUE. I agree 100 percent with what she's saying. And, to have healthcare in hospitals be for-profit means that nurses aren't a billable service. So, if you're trying to make a profit, the

32

same amount of work has to be done at the end of the day, whether there's one nurse to do it or 10 nurses to do it. So, there's no incentive for a for-profit company that's looking to get every dime out of the hospital and all the services, to add more nurses. They don't care how your day is. They're not there to actually help patients. They're there to make money.

Until it's not for profit and it's actually for the patients, then they will put more nurses on because it's not, wherever the funding comes from to help the hospital so that they can provide the correct amount of staff. Because no for-profit company is going to do it out of their own pockets, obviously because they want the profits for them. It's just they've lost sight of what it's for. We're not a company that's putting handles on buckets, like, it's people and it matters. It's their lives, it's your family, my family.

Any of the people that are actually owning these companies, they'll never be in that situation, because they're going to go to the VIP section. They're going to be, "Oh, this is the CEO of whatever, blah, blah, blah." They're going to be taken to the best room. They're going to be taken quickly out of—so they'll never know what it's really like where the rest of the people that are there in their hospitals are the ones suffering from their choices.

Senator HICKENLOOPER. I'm out of time, but it's compelling. I mean, obviously something's got to give.

The CHAIR. Well, thank you for your questioning, Senator Hickenlooper. And I think the issue that you raised is, if you're a young person interested in going into healthcare, do you want to walk into a disaster like that at a time when we desperately need young people to do it. It's a very important point.

The other point that I would pick up on is what Senator Braun made a moment ago, that in the midst of everything that we are talking about today, please don't forget, we are spending twice as much as what other countries spend per capita over $13,000 for every man, woman, and child in America. And this is what we are getting.

Senator MURPHY.

Senator MURPHY. Thank you very much, Mr. Chairman. Thank you all for being here. This is a very important hearing. It's important because, well, we are focused on this particular company and this set of horror stories. What is happening in your hospitals is happening all across the country. I wish this were not true, but there are hundreds of Ralph de la Torres who are making a disgusting fortune off of withholding healthcare from people in need.

I just want to tell you a quick story about what's going on in Connecticut. In 2016, a company called Prospect Medical Holdings that is owned by a private equity company, Leonard Green and Partners bought three hospitals in Connecticut, three small hospitals, Manchester Hospital, Waterbury Hospital, Rockville Hospital. You know exactly what happened. Immediately, they started stripping services out of these hospitals. Same story you're telling. All of a sudden, supplies started running short. All of a sudden, specialists couldn't be found because they were cutting them off of

the rolls. The elevators stopped working in these hospitals just like they did in your hospitals.

By 2018, these hospitals were in trouble. Everybody knew it. Prospect was looking for a new buyer to just flip the hospitals to make more money. In that year, in 2018, Leonard Green took $658 million in fees and dividends. As these three hospitals in Connecticut were essentially dying in front of our eyes, patient quality was being compromised.

John Danhakl is the managing partner of Leonard Green. There's a lot of various reports about how much he's worth, but likely in the neighborhood of a billion dollars. I mean, how have we let American capitalism get so off the rails? So, unmoored from the common good that anybody thinks it's Okay to make a billion dollars off of degrading healthcare for poor people in Waterbury, Connecticut. A, how do you live with yourself? But B, why do we accept that as a country?

This is just a choice to decide to commoditize our healthcare system, in Connecticut, in Louisiana, in Massachusetts, in every state across this country. And we have enough data at this point to know quality is worse, often way worse when these private equity companies come in. And not just in hospitals, in nursing homes, the death rate in nursing homes owned by private equity companies is 10 percent higher than in those not owned by private equity firms. So, there's no mysteries of what's going on here.

Ms. MacInnis, I wanted to just ask you a simple question. You've talked about this before, but I mean, let's acknowledge that every hospital has to make money, right? You have to make money in order to operate. So, nobody begrudges a hospital for making decisions that allow it to make more money than it puts out.

The question is this, are you making money for the purpose of providing good healthcare, or are you making money for the purpose of making the owners filthy rich? And every decision that happens in a hospital is different, if you are making money to provide good healthcare versus making money to make the owners filthy rich. You were there before and after.

Ms. MacInnis. Yes, I was.

Senator Murphy. Just in the remaining minute, tell us a little bit about what it was like on the ground floor before this company comes in, right? And then after the company comes in. Can you feel it as an employee, the difference in the value system of the owners?

Ms. MacInnis. Yes. It's noticeably different. I used to work on an interim coronary care unit, and we gave the best care. We took care of some of the sickest patients outside the ICU, and we gave the best care. We had a one to three, a one to four ratio. I never, ever, ever, in the two and a half years that I worked on the floor, we never had a code. And that's because we were able to rescue our patients. We had enough eyes, enough hands, good assessments, good monitoring, enough nurses around, frankly, because——

Senator Murphy. Because the focus was providing good care.

Ms. MacInnis. Because the focus was—yes. And when things got tight, what Caritas Christi did is they let go assistant nurse man-

34

agers, and then they let go other people. The very last thing that they did, and they actually never did, was get rid of staff nurses, get rid of bedside nurses. They kept us well staffed, and we took the best care of our patients. I was so proud to work at St. Elizabeth's.

After just Steward took over, it's just axe and axe and just taking away everything, violating agreements that they made with us, they laid off all the nursing assistants on our maternity floors. Imagine running a maternity floor with no—well, I can tell you as a nurse, it's an absurd prospect. They lay off our educators. Now they're cutting right where—for patient facing staff.

Whereas Caritas Christi absolutely prioritized that to the point where they stopped funding our retirement plan. They took away a lot of other things before they took anything away from our patients.

Senator MURPHY. Because the purpose is making as much money to make the owners filthy rich. Right? And it's just when there is a fundamental difference in the purpose, there's a fundamental difference in what happens inside that hospital. And that's just the reality.

Ms. MACINNIS. Yes.

Senator MURPHY. Thank you.

Ms. MACINNIS. Absolutely.

The CHAIR. Thank you, Senator Murphy.

Senator Cassidy, did you want to—I think we have come to the end. Did you want to have unanimous consent or?

Senator CASSIDY. Yes, thank you. I ask unanimous consent to enter into the record the letter we received from Dr. de la Torre, and the Committee's response to that letter.

The CHAIR. Without objection.

[The following information can be found on page 38 in Additional Material:]

The CHAIR. Let me very sincerely thank all four of our witnesses. Thank you for what you have done for your hospitals and your communities. And thank you for telling the American people what has been going on with Steward Healthcare. And I'll pledge to you, and I think I speak for Senator Cassidy as well, we are going to pursue this. This is not the last discussion of this. And if Dr. de la Torre thinks that he is comfortable by not being here today, Dr. de la Torre, if you're watching, you're wrong. This will be pursued.

With that, let me thank everybody for participating. I once again note that Dr. Ralph de la Torre, CEO of Steward Healthcare did not comply with the HELP Committee's subpoena and attend the hearing today. I ask unanimous consent to enter into the record a statement from Senator Casey, from stakeholders in support of the Committee investigating this matter.

[The following information can be found on page 35 in Additional Material:]

The CHAIR. For any Senators who wish to ask additional questions, questions for the record will be due in 10 business days, September 26th by 5 p.m.

35

This Committee stands adjourned.

## ADDITIONAL MATERIAL

STATEMENT FOR THE RECORD OF SENATOR ROBERT P. CASEY, JR.

Chair Sanders, Ranking Member Cassidy, thank you for convening this important hearing to discuss the bankruptcy of Steward Health Care and the impact of these bankruptcy proceedings on local communities. I am disappointed that Dr. de la Torre defied the subpoena this Committee authorized and has chosen not to appear today. I hope that the Committee will be able to hear from him soon.

I would like to highlight the experience of a community in Pennsylvania, the town of Sharon, which is in Mercer County. Sharon has experienced many struggles in recent years, but the local community has been working hard to revitalize the town and promote economic growth in the region. Key to those efforts has been the Sharon Regional Medical Center, which is one of the largest employers in the county. Sharon Regional Medical Center is owned by Steward Health Care, the only hospital that Steward still owns in Pennsylvania. And now, this hospital is at risk of closing due to the bankruptcy. Closing Sharon Regional Medical Center would have devastating consequences on the local community.

The Sharon community's experience highlights the precarity of too many of our community hospitals, institutions that are pillars of their communities, supporting jobs and providing local, life-saving medical care. It calls into serious question the role of private equity and complex corporate ownership structures that are increasingly wading into the health care sector, placing profit above people. Many smaller community hospitals and rural hospitals continue to face financial burdens exacerbated by the pandemic and cannot survive when those burdens are compounded by corporate greed.

To illustrate how important it is that we keep community hospitals in the hands of their communities and with their doors open, I am including three letters from members of the local community about the importance of Sharon Regional Medical Center, which are illustrative of how vital the hospital is to the local community.

Several of their thoughts stood out to me. One physician in the community wrote, "Instead of a growing, robust medical community, we find ourselves having to send our patients further and further for specialty care, or our patients must wait for months to be seen locally." The head of the local federally Qualified Health Center network said, "Community hospitals play a crucial role in coordinating care and ensuring continuity for patients with complex health needs. The loss of this resource would disrupt established care plans, complicating the management of chronic diseases and increasing the risk of adverse health outcomes." And the Sharon City Manager wrote, "The city of Sharon has finally reached a turning point in a robust revitalization movement. The effect of the loss of the City's medical system and one of the county's largest employers would stall and set back that movement which has been of vital importance to the future growth of the city, valley, county, and region."

As you can see, the impact of a hospital closing can be devastating to the community. I am grateful that the Committee on Health, Education, Labor, and Pensions is taking a serious look at how we ended up facing this situation, and thinking about what we can do to support community hospitals remaining in the hands of their community members and serving the community.

———

DEAR SENATOR CASEY:

I am a primary care doctor employed by Steward Medical Group, now Stewardship Health, though, like the other primary care clinics in the Steward system, we have now been acquired by Rural Healthcare Group (a Tennessee-based firm owned by Kinderhook Industries, LLC—another for-profit, private investment firm). I became a primary care doctor because the health of my neighbors and community is important to me. I have practiced medicine in Western PA for over 20 years now, and I love the area and the people of rural Pennsylvania.

Sharon Regional not only provides health care for the people of Mercer county and surrounding regions, but it is the largest employer in Mercer county, with approximately 1800 employees. As a primary care physician, I do not work directly for the hospital, but I feel more than comfortable sending my patients there for inpatient care when they are ill, and to specialists who utilize the hospital for procedures and surgeries.

During Steward's tenure, I have seen the closure of our regional cancer center and our maternity ward and OB/GYN services. These were "business decisions" that were justified, we were told, by underutilization; this does sound legitimate, given the closures of these kinds of medical services all over rural Pennsylvania. However, the lack of services did not stop there; increasingly, we noticed surgeries and cardiac procedures getting canceled due to lack of supplies because vendors weren't getting paid. In our own clinic, we and our staff took up janitorial work for the same reasons—emptying garbage cans, mopping floors, and cleaning toilets because the contracted janitorial service had not been paid. Most concerning was when some of our specialists, with whom we had forged trusting bonds, left because they were unable to perform the procedures they were trained to do due to lack of surgical supplies. Instead of a growing, robust medical community, we find ourselves having to send our patients further and further for specialty care, or our patients must wait for months to be seen locally. Now, we worry daily about the future of Sharon Regional Hospital, which is the hospital that we, as Steward employees, must also utilize for our own health care. As a primary care group, we don't know if we will have any specialists left locally to refer our patients to if the hospital should close. And as for future doctors and nurses who may have wanted to train and settle down and work here? Well, due to the bankruptcy, the nursing school—which has been in existence here for over 150 years, had to close, and the Family Practice residency program at Trumbull—the other Steward hospital in the PA/Ohio area—is in jeopardy. There is no other hospital in our area that would be able to absorb the patient load that would be left in the wake of a closure of Sharon Regional; and, as mentioned before, our community would be further devastated by the loss of jobs.

I will say that the health care workers and support staff at our hospital and clinics are the most dedicated, compassionate, hard-working, and professional group of people I have had the pleasure to work with. It has been disturbing and devastating to read about the downfall of Steward and the behind-the-scenes financial manipulations that brought us to this point. Health care is not just a business to us; it is a calling to care for our fellow human beings. It is sacred work. A hospital is not some "asset" to be bought and sold—it is one of the cornerstones of a community, providing aide and comfort to everyone when most vulnerable. There should NEVER be an instance when corporate interests outweigh the health care needs of our communities.

I took an oath to lead my life and practice my art in uprightness and honor. I know I speak for my physician colleagues, as well as my nursing and support staff, when I say that I wish those to whom we had entrusted the health and lives of our patients, our community, and ourselves had chosen to lead us in a similarly honorable way. Instead, we feel let down, taken advantage of, and used like so many pawns on a chessboard in a game that enriched the few at the top, and left our communities devastated.

Thank you for your time.

———

HONORABLE MEMBERS OF THE SENATE:

Thank you for the opportunity to address this critical issue on behalf of Primary Health Network, the largest community health center in Pennsylvania and one of the largest in the Nation. The potential closure of a community hospital, like Sharon Regional Health System, would have profound and far-reaching impacts on our health center and the communities we serve. Here's a summary of the repercussions we would face:

1. **Loss of Specialty Care Providers and Delayed Referrals**: The closure of a community hospital would result in the immediate loss of specialty care providers who are crucial to our healthcare system. Their departure would greatly reduce access to specialized medical services and lead to increased delays in referrals. Patients would face longer wait times for necessary care, potentially causing conditions to progress and complicating treatment. This strain on our already limited resources would force patients to travel long distances for care, or, in some cases, forgo it entirely.

2. **Increased Pain and Suffering**: The lack of a nearby community hospital means longer travel times and greater logistical challenges for accessing emergency and routine care. This can exacerbate health conditions, particularly for those with chronic illnesses, the elderly, and individuals with limited mobility, leading to increased pain and suffering.

3. **Economic Impact on the Community**: The closure would have significant economic repercussions, including job losses and decreased local eco-

37

nomic activity. Community hospitals are major employers and economic contributors, and their closure would ripple through the local economy, impacting jobs and economic stability.

4. **Psychological and Social Effects**: The stress and anxiety caused by inadequate access to healthcare can profoundly affect the mental health of our community. Patients may experience increased psychological distress due to the uncertainty and difficulty in obtaining care, impacting their overall quality of life.

5. **Disruption of Continuity of Care**: Community hospitals play a crucial role in coordinating care and ensuring continuity for patients with complex health needs. The loss of this resource would disrupt established care plans, complicating the management of chronic diseases and increasing the risk of adverse health outcomes.

In summary, the closure of a community hospital would have devastating consequences, including the loss of essential specialty care providers, delays in specialty care, increased pain and suffering, economic decline, and significant psychological and social impacts.

We urge you to carefully consider these repercussions and work toward solutions that preserve and enhance the availability of essential healthcare services in our communities.

Thank you for your attention to this important matter.

Sincerely,

DR. GEORGE GARROW,
CHIEF EXECUTIVE OFFICER,
PRIMARY HEALTH NETWORK.

---

ROBERT G. FISCUS CITY MANAGER,
SHARON, PA,
September 9, 2024.

**RE: Potential Closure of Sharon Regional Medical Center, located in Sharon—Mercer County, PA**

DEAR SENATOR CASEY:

With the potential closure of Sharon Regional Medical Center (SRMC), located in Sharon, PA, this letter is to address the concerns pertaining to the extremely negative impact this situation could have on the Shenango Valley, the heart of the most populated area of Mercer County, and surrounding areas. The city of Sharon has finally reached a turning point in a robust revitalization movement. The effect of the loss of the City's medical system and one of the county's largest employers would stall and set back that movement which has been of vital importance to the future growth of the city, valley, county, and region.

The negative impact of the potential loss of SRMC in summary:

- **Loss of Essential Local Healthcare**: The absence of a full-service healthcare provider will necessitate that Shenango Valley/Mercer County residents in need of essential and/or specialized medical care would now need to travel an hour and a half to Erie, Pittsburgh or out of state into Ohio.
- **Countywide Job Loss**: SRMC is considered one of the largest, if not the largest, employers in Mercer County and, if closed, the loss of jobs would devastate the city, county, and region. The unemployment rate would rise, impacting workforce opportunities which, in turn, would push residents to leave the county to pursue medical-related jobs elsewhere. Losing SRMC also has the potential to negatively impact the housing market with those unemployed or underemployed at risk for home foreclosure.
- **Emergency Medical Response Impact**: Local private ambulance services' out-of-service time will increase as the usual local EMS transport time will increase significantly, further damaging an already fragile emergency medical system. Mercer County is already stressed with ambulance shortages, and the additional out-of-service times will inevitably lead to more instances of not having local ambulances available. Additional drive time may also increase the cost of EMS transport to Mercer County residents.

38

- **Behavioral Health Impact**: SRMC is the only local inpatient behavioral health provider in Mercer County. In its absence, patients will be displaced to UPMC Western Psychiatric in Pittsburgh or Penn Highlands in Dubois. Besides transportation challenges for patients and their family members, this will send money provided by the Mercer County Behavioral Health Commission out of Mercer County to those providers, further damaging the local/regional economy.
- **Local Financial Impact**: The City of Sharon would potentially lose (at minimum) 5 percent of the City's annual operating budget which comes from revenue directly related to SRMC, and the indirect economic damage would negatively impact the City's already challenging budget constraints. The necessary budget cuts would equate to a reduction of city services and reduced personnel complements, which could equate to less police officers, firefighters, and public works employees, among others.
- **Municipal Impact**: The absence of a local healthcare provider would create an additional burden on our municipal police and fire departments with increased demand related to longer service times for out-of-town emergency medical and behavioral health transport. In addition, this increased demand would come at a time when deep emergency service reductions would be necessary to avoid municipal bankruptcy.

Per the points above, this situation has the very real potential to negatively impact our city, community, and county for years to come.

Thank you for your attention to this important matter and advocation for a positive resolution.

Sincerely,

ROBERT FISCUS,
SHARON CITY MANAGER.

———

QUINN EMANUEL, TRIAL LAWYERS,
WASHINGTON, DC,
*September 18, 2024.*

Hon. BERNIE SANDERS, *Chairman,*
*U.S. Committee on Health, Education, Labor, and Pensions,*
*Washington, DC.*

Re: Senate HELP Committee Subpoena to Dr. Ralph de la Torre.

DEAR SENATOR SANDERS:

We write to follow-up on our September 4, 2024 letter ("Letter") to the Senate Health, Education, Labor, and Pensions Committee (the "Committee") and the Committee's recent announcement that it intends to vote this week on two contempt resolutions regarding the July 25, 2024 subpoena issued to Dr. de la Torre, in his capacity as Chairman and Chief Executive Officer of Steward Health Care System LLC ("Steward"), for testimony at the Committee's September 12, 2024 hearing titled "Examining the Bankruptcy of Steward Health Care: How Management Decisions Have Impacted Patient Care" (the "Hearing").

Dr. de la Torre lacks the authority to speak on behalf of Steward with respect to the ongoing bankruptcy proceedings and he is prohibited by a Federal court order from doing so. Despite these valid objections, however, the Committee moved forward with the Hearing without meaningfully considering the issues that Dr. de la Torre raised and without attempting to reschedule the Hearing. What is more, the Committee's disregard for Dr. de la Torre's request to reschedule the Hearing in light of these legal restrictions substantiated our concern that the true purpose of the Hearing was not to gather facts within the Committee's constitutional and congressional remit, but instead a pseudo-criminal proceeding with the goal of convicting Dr. de la Torre in a court of public opinion.

Our concerns that the Hearing would be used to ambush Dr. de la Torre in a pseudo-criminal proceeding were on full display last week, with the Committee soliciting testimony from witnesses calling Dr. de la Torre and Steward executives "health care terrorists" and advocating for Dr. de la Torre's imprisonment, all while the Committee refused to even acknowledge or aid the bankruptcy settlement that would ensure continuity of services in all but two Steward hospitals across the Nation.

Dr. de la Torre cannot be permitted to provide sworn testimony at this time, given that the Hearing was seemingly designed as a vehicle to violate Dr. de la Torre's

39

constitutional rights, including his Fifth Amendment rights. The U.S. Constitution affords Dr. de la Torre inalienable rights against being compelled by the government to provide sworn testimony that is specifically (yet baselessly) sought to frame Dr. de la Torre as a criminal scapegoat for the systemic failures in Massachusetts' health care system. Accordingly, on the advice of counsel, Dr. de la Torre invokes his procedural and substantive rights under the Fifth Amendment of the U.S. Constitution, including the privilege to refrain from testifying at the Committee's Hearing. *See Quinn v. United States*, 349 U.S. 155, 161 (1955). ("Still further limitations on [Congress's] power to investigate are found in the specific individual guarantees of the Bill of Rights, such as the Fifth Amendment's privilege...").

If the Committee had any concern for the hospitals affected by Steward's bankruptcy proceedings it would, consistent with Dr. de la Torre's request to postpone the hearing for a more appropriate time, permit the bankruptcy resolution to move forward and focus its actions on tackling legitimate questions in the best interests of Steward patients, hospitals, and communities.

Sincerely,

ALEXANDER J. MERTON.

———

U.S. SENATE,
COMMITTEE ON HEALTH, EDUCATION, LABOR, AND PENSIONS,
WASHINGTON, DC,
*September 25, 2024.*

ALEXANDER J. MERTON, *Partner,*
*Quinn Emanuel,*
*Washington, DC.*

DEAR MR. MERTON:

We write in response to your letter of September 18, 2024. As explained in our letter of September 5, 2024, your client, Dr. Ralph de la Torre, had a legal duty to attend the hearing of the U.S. Senate Committee on Health, Education, Labor, and Pensions on September 12, 2024, as commanded by the duly authorized Committee testimonial subpoena issued to him on July 25, 2024, for which you accepted service on his behalf and indicated his availability.

As further explained in our September 5, 2024, letter, had Dr. de la Torre appeared to testify, he would have had a full opportunity to assert his Fifth Amendment right against self-incrimination in response to questions posed to him by Members of the Committee that implicated that right. Having elected not to appear, Dr. de la Torre willfully placed himself in default of the Committee's subpoena. Your effort to assert the Fifth Amendment, on your client's behalf, after the fact, and generally rather than in response to specific questions, is untimely and inadequate and does not cure your client's default.

In response to Dr. de la Torre's failure to appear, the Committee convened an executive session on September 19, 2024, and voted to report two resolutions to the Senate for further consideration. The first directs Senate Legal Counsel to bring a civil action to enforce the Committee's subpoena and the second authorizes the President of the Senate to certify a Committee report regarding the refusal of Dr. Ralph de la Torre to appear and testify before the Committee to the U.S. Attorney for the District of Columbia for criminal prosecution. Both resolutions were agreed to and favorably reported by the Committee.

Sincerely,

HON. BERNARD SANDERS,
CHAIRMAN.
HON. BILL CASSIDY, M.D.,
RANKING MEMBER,
U.S. SENATE COMMITTEE ON HEALTH,
EDUCATION, LABOR, AND PENSIONS.

———

[Whereupon, at 11:40 a.m., the hearing was adjourned.]

○

## Domestic Shipments

- To qualify for the Letter rate, UPS Express Envelopes may only contain correspondence, urgent documents, and/or electronic media, and must weigh 8 oz. or less. UPS Express Envelopes containing items other than those listed or weighing more than 8 oz. will be billed by weight.

## International Shipments

- The UPS Express Envelope may be used only for documents of no commercial value. Certain countries consider electronic media as documents. Visit ups.com/importexport to verify if your shipment is classified as a document.
- To qualify for the Letter rate, the UPS Express Envelope must weigh 8 oz. or less. UPS Express Envelopes weighing more than 8 oz. will be billed by weight.

BRIAN EVANS
(854) 214-3076
#1505
2000 S OCEAN DR
HALLANDALE BEAC  FL 33009

2.0 LBS LTR
SHP WT: 2 LBS
DATE: 08 NOV 2025

SHIP WILKIE D FERGUSON JR US COURTHOUSE
TO:  CLERK S OFFICE MIAMI COUTRHOUSE COM
RM 8N09
400 N MIAMI AVE

MIAMI  FL 33128-1805

FL 330 9-03

UPS NEXT DAY AIR                1
TRACKING #: 1Z 361 E83 01 4168 3578

CLERK'S OFFICE MIAMI COUTRHOUSE
400 N MIAMI AVE
RM 8N09
MIAMI FL 33128

P:YELLOWPD7  1 PD7
DT1-2048

REC'D BY_____ D.C.

NOV 10 2025

ANGELA E NOBLE
S. D. OF FLA - MIAMI

Serving you for more than 100 years
United Parcel Service.

Visit theupsstor
about our Print

**UPS Ground®**
**UPS Standard®**
**UPS 3 Day Select**
**UPS Worldwide E**

Do not use this en

Apply shipping d

0188025070? 08